

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00031-CV

**IN THE INTEREST OF O.N.H.** and D.H., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2010-PA-02788
Honorable Cathleen M. Stryker,[1] Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:        Catherine Stone, Chief Justice
                Sandee Bryan Marion, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  April 24, 2013

AFFIRMED

Donnie H.,[2] the father of the children in this matter, appeals the trial court's order terminating his parental rights. He contends that the evidence was legally and factually insufficient to find that termination was in the children's best interest. We affirm.

### PROCEDURAL HISTORY

In December 2010, the Texas Department of Family and Protective Services obtained an order appointing it the temporary managing conservator for the children, O.N.H. and D.H. For the next year and a half, the Department worked with the parents to achieve reunification. A

---

[1]This case was tried by the Honorable Charles E. Montemayor, Associate Judge, appointed pursuant to section 201.201 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 201.201, *et seq.* (West 2008 & West Supp. 2012). The Associate Judge's Report and Order was signed and adopted by the Honorable Cathleen M. Stryker, presiding judge of the 224th Judicial District Court of Bexar County, Texas.

[2]To protect the identity of the minor children, we refer to the children's parents by their first name and last initial and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2008); TEX. R. APP. P. 9.8(b)(2).

bench trial on the merits of termination was held in four settings between June and December of 2012. At the conclusion of the trial, the court terminated both parents' rights. Donnie H. filed this appeal.[3]

### STANDARD OF REVIEW

Judgments terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West 2008 & West Supp. 2012). To determine if the heightened burden of proof was met, we employ a heightened standard of review—judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role. *Id.* at 26. We are not to reweigh issues of witness credibility but "must defer to the [factfinder's] determinations so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We hold the evidence to be factually insufficient only if, in the light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

Legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence

---

[3]Susana H., his wife and the children's mother, did not appeal the termination of her parental rights.

that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the State's heightened burden of proof by clear and convincing evidence. *Id.*

### BEST INTEREST

The Family Code permits termination of parental rights upon proof that: (a) termination is in the child's best interest, and (b) the parent has committed an act or omission listed in section 161.001(1). TEX. FAM. CODE ANN. § 161.001 (West 2008 & West Supp. 2012). The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is the child's best interest—especially if the evidence was undisputed that the parental relationship endangered the child's safety. *Id.* Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest, *In re C.H.*, 89 S.W.3d at 28; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is *currently* in the

child's best interest. *In re W.C.*, 98 S.W.3d 753, 765–66 (Tex. App.—Fort Worth 2003, no pet.). However, it is proper to measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

## THE EVIDENCE

Donnie H. and his wife Susana H. were married in 2001 and have had three children together. O.N.H., born in 2005, and D.H., born in 2007, are the subjects of this case. Their third child, E.H., was born during the course of the removal proceeding and died two months after her birth. Both parents testified at trial; the two other witnesses were the initial investigating and removing caseworker, Natalie Mechler, and the current caseworker, Tara Briggs. The trial court terminated both parents' rights. With respect to Donnie, the trial court found terminating his rights was in the children's best interest and Donnie had committed two of the acts or omissions in section 161.001.[4]

### Susana's Alcoholism

The trial court heard extensive testimony about the severity and persistence of Susana's alcoholism. One parent's endangerment of a child by continued exposure to the other parent's uncontrolled drug habit is a relevant consideration in determining a child's best interest. *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no pet), *overruled on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002). Donnie testified that he was determined to keep living with Susana as long as she was making

---

[4]The trial court found that Donnie "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]," TEX. FAM. CODE ANN. § 161.001(1)(d) (West 2008 & West Supp. 2012); and "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child[ren] who ha[ve] been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child[ren]'s removal from the parent under Chapter 262 for the abuse or neglect of the child[ren], *id.* § 161.001(1)(o) (West 2008 & West Supp. 2012)."

efforts to fight her alcoholism, and his inability or refusal to grasp how his wife's alcoholism affects their children was a major issue at trial. The trial court could have properly considered the severity of Susana's alcoholism as relevant to whether Donnie's rights should be terminated.

Susana acknowledged she has struggled with alcohol for over ten years; the longest period of sobriety that either parent could recall was the nine months she was pregnant with O.N.H. Susana admitted that she drank while pregnant with D.H. and with E.H; D.H. has been diagnosed with Fetal Alcohol Syndrome.

She agreed she sometimes drinks so excessively that she loses consciousness and cannot remember what happened. The investigation that led to the children's removal stemmed from a report that Susana had taken alcohol into a Salvation Army Center in a child's sippy cup, passed out, and left the children unsupervised. She said the children had "tricked" her by pretending to be asleep.

Donnie testified that he had called the police several times to assist him in leaving the house when Susana was intoxicated. She would hide his keys or otherwise try to block him from leaving. Sometimes she would kick, hit, or spit on him. One time, Donnie took the children away and would not tell her where they were because he was so frustrated with her drinking. In retaliation, she filed a domestic-violence complaint so the police would locate him and the children. The police found them, and Donnie was incarcerated for several months. The Department removed the children from Susana during his incarceration.

In the two years this case was pending before the trial court, Susana continued drinking and had made almost no progress in combating her alcoholism. E.H. was conceived and born during that period, but Susana testified she did not know she was pregnant until she was five months along. Although Susana could not recall whether she had been drinking the night E.H. died, Donnie testified she had been. He told her to go to bed, and that he would put E.H. to bed.

Donnie elected to let E.H. cosleep with him and Susana that night. E.H. was not breathing the next morning and was pronounced dead at a hospital. The death certificate did not fix a cause of death, noting that SIDS was possible, but also indicating that cosleeping was a potential factor and that asphyxiation could not be ruled out.

Susana testified that she drinks in response to depression or stress. She admitted that she drank the weekend before the second hearing of this trial and that she tends to relapse after three or four months of not drinking. In December 2011, the police picked up Susana from the Department's offices because she was intoxicated while on a visitation with her children. She had brought another sippy cup full of beer and refused to leave a bathroom stall to take a drug test. She has participated in four different rehabilitation programs, but did not complete any of them.

### *Domestic Violence*

Donnie and Susana gave conflicting accounts about the level of domestic violence between them. Susana told both caseworkers and the police that Donnie would kick or punch her every couple of months. But she testified that she made up the incident that resulted in his arrest. Caseworker Briggs testified that, although Susana admitted she fabricated that incident, she had also told her about a continuous pattern of violence. They would both slap, punch, kick, or be otherwise violent to each other. Susana has stayed at a battered women's shelter.

Donnie generally denied that he had been physically violent to Susana, other than having to restrain her when she attacked him. He did agree that she would regularly push him, kick him, or otherwise attack him when she was drinking. He testified that he called the police to help him leave the house because he did not want to be accused of domestic violence. He agreed that it was a form of abuse for the children to be exposed to an environment where physical abuse occurred even if it was not directed toward them. He later denied there was abuse in their home.

Caseworker Mechler testified O.N.H. told her "she doesn't like it when her parents fight; that they both fight and slap each other." Briggs indicated that the family's domestic violence issues were tied up with Susana's alcoholism. Susana testified there was currently much less violence in their relationship and she was struggling to fight her dependency. But even if Susana were actually completing treatments and working toward her goals without frequent relapses, "[factfinders] are not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513 (Tex App.—Houston [14th Dist.] 2003, pet. denied).

### *Donnie's Toleration of Susana's Alcoholism*

At trial, Donnie conceded he had long tolerated and enabled Susana's alcoholism. He would leave O.N.H. and D.H. with Susana while he was at work—even though he knew she started drinking in the afternoon before he got home. He justified it because she did not get drunk until later in the evening when he was home. He admitted he would go out and purchase alcohol if Susana wanted more. To purchase the alcohol, he would leave O.N.H. and D.H. at home because they were sleeping and therefore "safe." During E.H.'s short life, she was also regularly left at home with Susana while Donnie worked. Donnie conceded he had no idea what Susana and the children did while he was at work.

The court also heard troubling testimony about Donnie's current and future plans for dealing with Susana and her drinking problem. The record is replete with instances of Donnie minimizing the extent of Susana's alcoholism, equivocating about how he will react to her continued drinking, and evading questions about how her alcoholism affects their children. For example, he would agree that Susana's drinking was a problem and she should not drink at all; but then immediately contend that she was fine as long as she only had one or two drinks. He said he would not allow alcohol in the house, but he also conceded he did not know what Susana

did during the day and historically she began drinking in the afternoon. Donnie testified that, if the children were returned to him, they would be in school all day and then with him when he got off from work at 5 p.m.; however, he also testified that Susana could have a limited intake of alcohol and still be a responsible caretaker. Instead of requiring that Susana abstain from alcohol, he stated he "hopes" that she will stop drinking and he would "prefer" that she stop. Despite testifying that he would no longer be an enabler, he has repeatedly accepted her relapses and has continued to live with her in spite of them. He testified in front of Susana that as long as she was trying to quit drinking he would not turn her out of the home, despite any relapses. He maintained that the only reason he would ask her to leave the home was if she hurt the children, herself, or him.

The evidence does show that Donnie has taken steps to increase his awareness of the effects of alcoholism and to stop being an enabler. For instance, he no longer purchases or provides alcohol for Susana and does not permit alcohol in the home. And although he did not attend with the frequency called for by his service plan, he has also attended Al-Anon meetings. He displayed some knowledge of the alcoholism, insofar as it is a life-long battle that requires an alcoholic to stop consuming alcohol. But he also admitted there is much he does not understand about alcoholism. Overall, his testimony reflects that his efforts to educate himself have yet to lead him to make significant changes in how he will attempt to protect his children from their mother's alcoholism.

The caseworkers testified Donnie's continuous minimizing of Susana's problems and his stated intention to continue living with her raised valid concerns about his ability or lack thereof to care for the children. Mechler testified this was troubling because in her experience Donnie's mindset makes him less able to protect his children. Briggs also testified Donnie has a "blind eye" toward his wife's drinking that detrimentally impacts his ability to take the necessary steps

to ensure the children's safety. Briggs cited E.H.'s death as an example. Donnie allowed the baby to cosleep with them, even though he knew Susana had been drinking and despite the fact that there was a bassinet next to their bed. Briggs also testified she would have considered Donnie for permanent placement of the children had he unequivocally separated from Susana.

### *Donnie's Non-compliance with the Service Plan*

Briggs testified Donnie had fulfilled many of the requirements of his service plan, but not all of them. Non-compliance with a service plan is probative of a child's best interest. *See In re W.C.*, 98 S.W.3d at 765. Briggs testified Donnie failed to comply with provisions of the court-ordered plan by failing (1) to demonstrate the ability to protect the children from abuse or neglect and show concern for the children's future safety; (2) to demonstrate the ability to put the children's needs ahead of his own; (3) to actively participate in therapy to address his issues with domestic violence and how it is impacting his family; and (4) to demonstrate the ability to parent and protect his children.

Donnie's lack of progress is apparent from his testimony. The trial court could have reasonably viewed his almost total resistance to separating from Susana as evidence that he does not have the ability to protect his children from abuse or neglect now or in the future and that he would not put his children's needs ahead of his own desire to keep the family intact. *See Edwards*, 946 S.W.2d at 138–39.

Donnie's therapist recommended divorce as the best way to protect his children. According to Briggs, Donnie misled his therapist by stating he had downloaded divorce papers and planned to divorce Susana. Donnie conceded he had told the therapist about this plan, but that he decided to "give[] it another shot to save our marriage, to save our family." Briggs testified Donnie's dishonesty with his therapist would prevent him from reaching a therapeutic result and this was inconsistent with his service plan. She also testified E.H.'s death showed he

was unable to protect his children and exercise good judgment regarding their safety. Donnie admitted he and Susana concealed E.H.'s birth from the Department and he would leave the newborn at home with her when he went to work. Briggs testified that this showed an inability to be protective of his children.

Donnie admitted he had not attended Al-Anon meetings as frequently as his plan called for, but he did attend meetings once a week.

Donnie also failed to identify a "positive support system"—a local person who would provide child care in the event of an emergency or if Donnie was overwhelmed. Having a strong support system in place is a factor in determining whether children can return to their natural parents. *See In re W.C.*, 98 S.W.3d at 766 (evidence that the appellant had "gained a good support system through her family and church" was probative that termination was not in children's best interest). In light of Donnie's stated intention to continue living with Susana, the trial court could have considered the lack of a positive support system extremely troubling. *See id*.

### Other Evidence

The evidence established Donnie had a stable job and a stable residence. This evidence weighs against finding that termination was in the children's best interest. *See Holley*, 544 S.W.2d at 372.

It was undisputed both children had expressed a desire to return home with their parents, but that factor should not outweigh the other evidence "that their home life was chaotic, that their emotional and physical well-being was threatened, and that their [parent] was unwilling to improve as a parent." *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 356 (Tex. App.—Austin 2000, no pet.). The trial court could justly discount the children's desires in light of the other evidence.

The children's *ad litem* attorney recommended termination as in their best interest. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (considering the *ad litem* attorney's recommendation in best-interest analysis). He testified that the "father seems to understand that the issue with CPS arose when mom was around . . . [a]nd they both have their own attorneys, and they were certainly counseled about the possible ramifications of staying together."

Donnie testified the children were abused and forced to fight with other children when they were first removed and placed in foster care. Briggs agreed that D.H. had unexplained bruises and scratches while with the first foster family, but that the children were no longer with that family. Donnie also testified the children became less outgoing after they had been removed. It was undisputed the children had never suffered physical abuse directed toward them while under their parents' care.

At the time of trial there was no set plan for the children's immediate adoption; this factor generally weighs against finding that termination was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28. But the lack of evidence for definitive placement plans is far from dispositive. *Id.* The children were currently living with foster parents who initially wanted to adopt, but could no longer do so. The Department had investigated placing the children with their paternal grandmother in Missouri, but a home study was unable to recommend her for placement. At the time of trial, the Department was considering another relative. However, as the trial court observed, the lack of an adoptive plan in this case may be weighed toward finding termination in the children's best interest: potential adoptive parents are often unwilling to commit to the adoption process when the natural parents still retain their parental rights— perhaps especially so when a case has dragged on for two years.

CONCLUSION

Unfortunately, the evidence shows Donnie does not adequately grasp the severity of Susana's alcoholism and the danger it poses to the children's emotional well-being and physical safety. Donnie tolerates and minimizes Susana's alcoholism, and that poses a serious danger to their children. This danger is compounded by his failure to demonstrate he would place his children's needs before his own if they were returned to him. Instead, the evidence shows Donnie places the highest priority on maintaining the family unit. Although there is undisputed evidence that the children wish to return home, Donnie has a stable job and has a home, and there is not yet a set plan for adoption, we are not tasked with reweighing the evidence. Our duty is to review whether a reasonable factfinder could have formed a firm conviction or belief that termination was in the children's best interest, even if some evidence points the other way. Viewing the evidence in the light most favorable to the judgment, we determine the trial court could have formed the firm belief or conviction that termination was in the children's best interest.

We have also examined the evidence and found that not a single disputed point of evidence is so controverted that a reasonable factfinder could not credit it. The main point of contention was whether Donnie, because of his failure to appreciate the extent of his wife's alcoholism and unwillingness to take steps to protect his children from its consequences, could provide a safe and loving home for them. Donnie's testimony that he would protect the children, that he had gained awareness about Susana's disease from Al-Anon, and that he would no longer be an enabler was overshadowed by his other testimony at trial. That testimony showed he failed or refused to grasp how detrimental Susana's alcoholism was to the children's emotional well-being and physical safety. The trial court was justly entitled to disbelieve his testimony that there was a safe and loving home to which his children could return, and to instead find that the

alcohol abuse and domestic violence in the home created an unstable and dangerous environment for the children. We hold it was reasonable for the trial court to resolve the conflicts in the evidence in favor of the finding that termination was in the children's best interest. We therefore conclude the evidence is factually sufficient to support the judgment.

We affirm the order of termination.

Luz Elena D. Chapa, Justice