

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00226-CV

**IN THE INTEREST OF R.L.**, X.L., P.L., and E.L., Children

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2010-PA-02484
Honorable David Canales,[1] Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Sandee Bryan Marion, Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: October 2, 2013

AFFIRMED

Robert L. and Samantha L. appeal the termination of their parental rights to their four

children.[2] Samantha L. contends the termination of her rights should be set aside on public policy

grounds because insufficient efforts were made to reunify her with the children. Robert L. contends

the termination of his parental rights was supported by legally and factually insufficient evidence.

We affirm.

---

[1] This case was tried by the Honorable Charles E. Montemayor, Associate Judge, appointed pursuant to section 201.201 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 201.201, *et seq.* (West 2008 & Supp. 2012). The Associate Judge's Report and Order was signed and adopted by the Honorable David Canales, presiding judge of the 73rd Judicial District Court of Bexar County, Texas.

[2] To protect the identity of the minor children, we refer to the children's parents by their first name and last initial and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2008); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

In November 2010, the Department of Family and Protective Services petitioned for the removal of the four children from Robert L. and Samantha L.'s custody and the termination of their parental rights. In April 2012, the trial court rendered a final order proposed by the Department that appointed the Department as the permanent managing conservator of the children and appointed the parents as possessory conservators. The order did not terminate the parents' rights.

In September 2012, the Department filed a petition to modify the April order, requesting the termination of the parents' rights. A bench trial on the merits of termination was held in four settings between December 2012 and March 2013. The trial court's written order terminated the rights of both parents. At the time of the order, R.L., the oldest was 13, and E.L., the youngest, was 8. This appeal ensued.

## EVIDENCE

Numerous witnesses testified about the events of this case beginning with the children's removal in November 2010. The Department offered the testimony of the children's foster parents, the Department caseworker in charge of the family's case, the CASA caseworker, the children's counselor, and the counselor who provided family counseling, couple's counseling, and individual counseling to Samantha L. Robert L. also testified. At trial, it was also established that the Department had conducted seven investigations of the family, beginning a month after R.L.'s birth. During a previous investigation, the Department had removed the children for eighteen months between October 2002 and March 2004.

*Events from the November 2010 Removal to the April 2012 Hearing*

The family was investigated and the children were removed because of accusations of physical abuse, neglect, and the children's failure to thrive. After their removal, the three oldest

children reported that Samantha hit them and neglected to feed them. R.L., the oldest child, specifically used the word "abuse" to describe Samantha's actions. P.L. and E.L. were so undernourished that they were diagnosed as failing to thrive for being at three percent of the standard height and weight. The children also reported that Samantha smoked in the house and had blown cigarette smoke in their faces in the past.

The evidence reflects the Department provided extensive services to the entire family in an effort to achieve reunification. The counselors and caseworkers testified that working with Samantha was difficult because she refused to take responsibility for her previous actions, resisted their suggestions about improving her parenting and household management, and accused the Department of exaggerating the circumstances surrounding the children's removal. Her counselor diagnosed her with "personality disorder" and "narcissistic traits" and ultimately concluded that she was a "selfish" person. The assessment of Samantha's selfishness was echoed by the other counselor and the caseworkers. Despite her general recalcitrance, the counselors and caseworkers agreed that Samantha began to show signs of improvement leading up to the April 2012 hearing.

The family counselor testified that Robert was very passive around Samantha, making excuses for her abuse and failing to stand up for his children. However, Robert was more calm and open-minded to receiving instruction on improving his parenting. The CASA caseworker testified that Robert told her he understood why the children were removed in November 2010 and that he would have done the same thing. One counselor worked with Robert to make him more proactive and less passive, and he testified that Robert had made progress. During counseling, Robert was advised he should consider separating from Samantha to have a better chance of reunifying with his children. Robert testified no one ever explicitly told him that, although it was suggested to him.

Family counseling revealed the three older children harbored a great deal of animosity or indifference toward Samantha because of her previous abuse. On the other hand, all the children

felt positively about their father and expressed some desire to live with him. While in the Department's care, R.L. and X.L. were diagnosed with adjustment disorder, and P.L. and E.L. were diagnosed with ADHD. They were prescribed medications to remedy these conditions and to help them sleep. According to the CASA caseworker, the children flourished under the structure and stability provided by the foster parents. After extensive efforts, the foster parents also succeeded in coaxing E.L.—who everyone agreed was a picky eater and required encouragement to eat—to eat regularly, resulting in her no longer being diagnosed as failing to thrive.

*Events from April 2012 Hearing to March 2013 Termination Order*

Because the caseworkers and counselors felt the parents were making sufficient progress leading up to the April 2012 hearing, they recommended to the Department that it not continue pursuing termination and instead give the parents additional time to develop their parenting skills. The Department did so, and the trial court accepted the Department's recommendation. It rendered an order appointing the Department the permanent managing conservator but denying termination of parental rights. In accordance with the parents' status as possessory conservators, the Department set up a series of scheduled visitations.

Although the initial unsupervised day visits went well, the events of the children's first overnight visit convinced the Department to discontinue all services to the parents and to petition for a modification of the final order, requesting termination. The children reported to their therapist and caseworkers that Samantha had spanked E.L. during the visit, despite being told that she should not do so in light of her history of physically abusing the children. Robert testified that Samantha disciplined E.L. with a single swat to her butt because, as the family was walking down the street, E.L. had broken away from Samantha's hand and darted into the street. The children reported that their parents refused to give them their prescribed medication, which Robert admitted was true. After not being given her medication, E.L. prevented the other children from sleeping all night.

When they told their parents, they simply sent the children back to their room. Robert testified he did not remember the children seeking help that night. Finally, the parents allowed E.L. to not eat dinner, despite her history of failing to thrive. Robert testified that they worked for an hour to convince E.L. to eat but only convinced her to drink a glass of fortified chocolate milk.

According to the children's counselor, the visit negatively impacted the children. It was not appropriate for Samantha to spank E.L. because of her history of abuse. The parents' refusal to administer prescribed medications to their children resulted in E.L. staying up all night and prevented the other children from sleeping that night. As a result, the children were extremely tired and disheveled when they returned to their foster parents. When asked why they did not give their children their medication, the parents told the Department caseworker that they felt that the professionals were wrong and the children were misdiagnosed and overmedicated. The parents' failure to ensure E.L. ate appropriately presented a safety issue, and in the counselor's judgment, the parents did not make a strong attempt to coax E.L. to eat, pointing out the foster parents had been successful in working with E.L. to ensure she ate.

The overnight visit convinced the counselors and caseworkers that the parents could not offer structure and stability for even a limited time. The visit also showed no more progress could be made with the parents: they had regressed by reverting to old behaviors and refusing to understand why their old behaviors were unacceptable. In light of the visit, the Department chose to end all visitation and services and moved to terminate the parents' rights.

Samantha refused to take responsibility for the events of the overnight visit and was unwilling to listen to any professional recommendation about how to care for her children. When the Department caseworker asked about her and her husband's actions during the overnight visit, Samantha was angry and defensive, stating:

> [she] and her husband did not believe in medicating children, and she wasn't going to medicate her children; that they were her children, and nobody was going to tell her what to do; that she had been told numerous times that physical discipline was not allowed, but she didn't feel there was any other appropriate form of discipline to use at that time and that she wasn't going to make her child eat if she didn't want to eat, even though she knows she was failure to thrive at one point; and that she had every right to be selfish.

Samantha's counselor testified Samantha continues to lack empathy for the children or take responsibility for her actions that led to the children's removal. The counselors and caseworkers agreed Samantha was selfish and stubborn, and intentionally chooses to act in ways that harm her children. In their opinion, her selfishness and lack of empathy rendered her unable to provide the children with a safe and protective environment.

In the Department caseworker's judgment, Robert displayed his regression because he did not intervene when Samantha spanked E.L. and allowed her to take the lead on punishing the children. Furthermore, the family counselor and caseworkers testified that Robert's expressed intention to keep his family whole showed he was unable to put his children's needs and safety first. They also testified that his relationship with Samantha put the children at risk and his refusal to leave her made him culpable for her acts.

Robert testified that he had a stable job and housing and had taken the lead in punishment by telling Samantha she should not have spanked E.L. and by sitting E.L. down to explain why she was punished. He also testified he had convinced Samantha to quit smoking after the overnight visit in the lead up to the trial. But her counselor testified he thought any attempt by Samantha to stop smoking after the Department resought termination was just a ploy.

Ultimately, the caseworkers and therapists testified that termination, not reunification, would be in the children's best interest because the parents could not meet the children's needs and they were at a risk of enduring further abuse if they went back to their parents. In their opinion,

the parents have shown an inability to change their behavior to support a structured and nurturing environment for their children. They concluded that they were unlikely to ever change because they had not changed despite having the incentive of reuniting with their children in front of them.

## TERMINATION OF SAMANTHA L.'S PARENTAL RIGHTS

Samantha contends this court should set aside the termination of her rights on public policy grounds because the Department did not make reasonable efforts to reunite her with her children, claiming "[t]he record clearly establishes [the Department] failed its statutory obligation to work with this family." Her complaint rests on the Department's decision to end all efforts at reuniting the family after the overnight visit. Samantha fails to identify the statutory authority imposing such a requirement or articulating her view of public policy. *See* TEX. R. APP. P. 38.1(i). Because Samantha's brief lacks any citation to or discussion of appropriate authorities supporting her point of error, Samantha has failed to adequately brief this issue. *See In re C.L.*, No. 04-03-00638-CV, 2004 WL 86136, at \*3 (Tex. App.—San Antonio Jan. 21, 2004, no pet.) (mem. op.).

We note that, in the context of conservatorship, the public policy of the state is to "assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interests of the child" and to "provide a safe stable and nonviolent environment for the child." TEX. FAM. CODE ANN. § 153.001(a)(1)-(2) (West 2008). The record discloses that the Department made substantial efforts to help Samantha achieve those policy goals, yet the parents continued to demonstrate their inability to meet those goals even after the Department chose not to press for termination. Based on the record before us, termination of Samantha's rights does not violate public policy.

## TERMINATION OF ROBERT L.'S PARENTAL RIGHTS

The trial court found that Robert committed two statutory acts or omissions under section 161.001 of the Family Code justifying termination. *See id.* § 161.001(1)(D), (O) (West 2008). It

also found that termination of his parental rights was in the children's best interests.[3] *See id.* § 161.001(2) (West 2008). We hold the court's findings were supported by legally and factually sufficient evidence.

*Standard of Review*

All orders terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001; 161.206(a) (West 2008). To determine if the heightened burden of proof was met, we employ a heightened standard of review—judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

When assessing whether evidence is legally sufficient, we look at all the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding. *Id.*

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* We hold the evidence to be factually insufficient only if, in the light of the entire

---

[3] A court may terminate parental rights, after previously denying termination, "if (1) the petition under this section is filed after the date the order denying termination was rendered; (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered; (3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and (4) termination is in the best interest of the child." TEX. FAM. CODE ANN. § 161.004(a) (West 2008). In such a proceeding, a court may "consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child" after the trial court previously denied a petition for termination. *See id.* § 161.004(b) (West 2008).

record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

*Endangerment under Section 161.001(D)*

The trial court found Robert endangered the children within the meaning of section 161.001(1)(D) of the Family Code. Subsection D permits termination if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D). "Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment under this subsection is an indirect result of a parental act or omission and may be found on the basis of a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367–68 (Tex. App.—San Antonio 1997, pet. denied).

The Department established the children were endangered by being at home under the care of Samantha, who physically abused and neglected them. By leaving them in her care, Robert left them in an environment injurious to their physical and emotional well-being as shown by the children's own account of Samantha's physical abuse and two of the children's failure to thrive. Robert himself admitted that he would have removed the children from their care under the circumstances the Department found at the beginning of November 2010.

During the children's overnight visit, Robert continued to allow Samantha to take the lead in disciplining their children, thereby endangering them. Robert permitted Samantha to punish E.L. corporally, despite knowing about her history of physical abuse and the counselors' recommendations that she not take the lead in disciplining the children. He joined her in the

decision to not give the children their medication that resulted in the children staying up all night and being unable to function properly the next day. Finally, he did not work with E.L., one of the children initially diagnosed as failing to thrive, to ensure that she received proper nutrition. The foregoing is legally sufficient evidence to support the finding of endangerment. *See In re J.F.C.*, 96 S.W.3d at 266.

Robert offered some controverting evidence of endangerment when he testified he told the Samantha it was not appropriate to spank the children, he coaxed E.L. to drink a fortified chocolate milk, and he convinced Samantha to stop smoking. Assuming *arguendo* the trial court credited his testimony, a reasonable factfinder could still, after weighing the evidence, form the firm belief or conviction that Robert endangered his children. *See id.* Because only one statutory act or omission must be proven to justify termination, we proceed to the best-interest analysis. *See In re R.D.*, 955 S.W.2d at 367–68.

*Best Interest*

The best-interest inquiry is a forward-looking determination that asks whether termination serves the best interest of the child in the future. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). Evidence that supports finding a parent has committed a section 161.001 act or omission is probative to support the best-interest finding but "the mere fact that [a section 161.001] act or omission occurred in the past does not *ipso facto* prove that termination is *currently* in the child's best interest." *Id.* The factfinder may look to a parent's past conduct as a measure of his or her future conduct. *Id.*

The Texas Supreme Court has enumerated factors relevant to the best-interest finding, apart from the section 161.001 acts or omissions: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the

programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. "Evidence of only one factor may be sufficient to support the best interest finding, especially if the evidence shows the parental relationship endangered the child's safety." *Id.*

The facts of this case are similar to the facts in *In re O.N.H*, 401 S.W.3d 681. In that case, this court upheld the best-interest finding supporting the termination of a father's parental rights because the father had shown an inability or unwillingness to protect his children from the deleterious effects of their mother's alcoholism. *Id.* at 686–87. In spite of the Department's efforts to educate the father about how his wife's alcoholism had affected their children in the past and how it would continue to endanger their children in the future, the father continued to insist his wife could be a good and loving mother and refused to separate from her. *Id.* We held his toleration and minimization of his wife's alcoholism posed a serious danger to their children. *Id.* at 688. That danger was compounded by his failure to demonstrate he would place his children's needs before his own and his insistence on maintaining his family unit. *Id.*

So too in this case, Robert has shown almost no ability or will to temper his wife's impulses, making him complicit in her endangerment of the children. *See id.* The trial court could justly look to Robert's past unwillingness to temper Samantha's behavior and thereby determine he could not provide for the children's physical or emotional needs, ensure their safety, and lacked adequate parenting abilities—*i.e.*, the second, third, and fourth *Holley* factors. *See id.* He has also shown that he would not put the children's well-being ahead of his desire to keep the family unit

together. *See id.* The counselors and caseworkers all recommended termination because returning the children to their parents would put them at risk of further abuse and neglect. The evidence shows that the children's physical and emotional health would be endangered by returning the children to their father's custody, and this weighs heavily in favor of termination.[4] *See In re C.H.*, 89 S.W.3d at 27.

Robert argues his stable employment and housing and the children's desire to reunite with him weigh in favor of reunification. We agree that his history of stable employment and housing weighs against termination. However, the desires of the children are, at best, mixed and do not weigh either for or against termination. In this case, Robert has made it clear that reunification with him is tantamount to reunification with Samantha. The three oldest children have expressed aversion or marked indifference to reunification with their mother. E.L., the youngest, has expressed a desire to reunite with both parents. However, the family counselor testified E.L. was too young to comprehend the abuse and neglect they had suffered. Because the desires of the children are relevant only to the extent that the children possess sufficient maturity to express an opinion regarding reunification, we do not find E.L.'s expressed desire compelling evidence. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.).

We hold that a reasonable factfinder could weigh the evidence and determine the danger posed to the children by reunification with their father outweighed the stability of his employment

---

[4] Robert asserts the Department did not offer evidence on the best interest factors outlined in section 263.307 of the Family Code. TEX. FAM. CODE ANN. § 263.307 (West 2008). The best-interest finding in that section relates to the review of a child's temporary placement during custody proceedings, not to the termination of parental rights. *See id.* Assuming *arguendo* those factors are relevant, the Department's evidence supported at least two of those factors: first, "the willingness and ability of the child[ren]'s family to effect positive environmental and personal changes within a reasonable period of time," and second, "whether the child[ren]'s family demonstrates adequate parenting skills, including providing the [children] with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities." *Id.* § 263.307(b)(11), (12). As our analysis under the *Holley* factors demonstrates, the record does not support Robert's assertion that "evidence was woefully lacking as to almost all of these factors."

and housing. *See In re C.H.*, 89 S.W.3d at 27; *In re O.N.H.*, 401 S.W.3d at 688–89. Accordingly, a factfinder could form the firm belief or conviction that termination was in the children's best interests. *In re O.N.H.*, 401 S.W.3d at 688–89. In addition, we hold it was reasonable for the trial court to resolve any disputed points of evidence in favor of termination. *See id.*

### CONCLUSION

We affirm the order of termination.

Luz Elena D. Chapa, Justice