

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00919-CV

**IN THE INTEREST OF D.B.T.**

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-02726
Honorable Michael E. Mery, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Karen Angelini, Justice
               Luz Elena D. Chapa, Justice
               Jason Pulliam, Justice

Delivered and Filed:  April 29, 2015

REVERSED AND RENDERED

Ruben appeals the trial court's termination of his parental rights to D.B.T.[1] He argues the trial court improperly granted a trial amendment to add a ground for termination and the evidence is legally and factually insufficient to support the trial court's finding that termination is in D.B.T.'s best interest. We reverse and render judgment.

### BACKGROUND

Six years after D.B.T. was born, Ruben moved to California in 2008, where he lives with his wife and two of his other children. D.B.T. continued to reside in Texas with Adriana (his mother) and Jose (the father of his siblings).

---

[1] To protect the identity of the minor child, we refer to the child's parents and grandparents by their first names and to the child by his initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

In 2013, the Department of Family and Protective Services sought to remove D.B.T. and his siblings from their home due to Jose's drug abuse and violence against Adriana. The Department filed a petition seeking termination of Jose and Adriana's parental rights to the children; it also sought to terminate Ruben's parental rights to D.B.T. under § 161.001(1)(D) and (E) of the Family Code. The trial court granted the Department's request for temporary managing conservatorship of the three children, who were thereafter placed with their maternal grandparents.

The case proceeded to a bench trial, and the Department admitted it had no evidence of the grounds pled to terminate Ruben's parental rights, but requested and was granted a trial amendment to terminate Ruben's rights under § 161.001(1)(O). The trial court found Ruben violated § 161.001(1)(O) of the Family Code and that termination was in D.B.T.'s best interest. Ruben now appeals the trial court's judgment terminating his parental rights.

## D.B.T.'S BEST INTEREST

Ruben contends the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in D.B.T.'s best interest.

### Standard of Review & Applicable Law

A judgment terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West 2014). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable determinations of credibility. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

A legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence. *Id.*

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* The evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*

The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27.

Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* "Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest." *In re O.N.H.*, 401 S.W.3d at 684 (internal citation omitted).

### *Evidence*

The evidence at trial primarily concerned Adriana's and Jose's relationships with their respective children. Few of the witnesses testified about Ruben's relationship with D.B.T., and the testimony was relatively brief.

Adriana testified that soon after D.B.T. was born, Ruben was ordered to pay child support and he continued to pay child support "sporadically." She explained D.B.T. knew who Ruben was, but D.B.T. did not refer to him or Jose as "dad."

Enedina, D.B.T.'s maternal step-grandmother with whom D.B.T. and his siblings were placed, testified she contacted Ruben because D.B.T. expressed interest "all the time" in establishing a relationship with him. When asked whether she thought it would be in D.B.T.'s best interest to have Ruben in D.B.T.'s life she responded, "Not for him to live with him but -- or for just mere curiosity. He wants to know his father."

Payden Sharkey, a caseworker for the Department, testified he mailed Ruben a service plan, and they had a few conversations over the phone. He testified Ruben and his wife and children live in California. According to Sharkey, Ruben "said that he has had no contact due to [Adriana] not allowing him contact. And she has verbalized that with me, too." Sharkey testified Ruben inquired about D.B.T.'s safety and whether he was placed in a good environment. He also

testified he discussed the possibility of Ruben visiting D.B.T., but told Ruben he did not believe it was in D.B.T.'s best interest at the time. Sharkey stated Ruben sent an "in-home parenting kit" to D.B.T.'s maternal grandmother. When asked whether he believed Ruben missed a lot of D.B.T.'s life, Sharkey responded, "All of it. He's actually told me that he only spent maybe a couple of months, and we're talking less than six which is testified to."

During Sharkey's testimony, the trial court admitted into evidence Ruben's family service plan as of December 2013. The plan indicated Ruben was ordered to participate in and complete a parenting course, keep in contact with Sharkey, and pay child support.

On cross-examination, Sharkey testified about the family service plan, stating Ruben paid $6,200 in child support in 2014 and made several payments in 2013. He also testified that although he was unaware of whether Ruben actually received the family service plan, he discussed the plan with Ruben and asked him to comply by finding a parenting course in California. Sharkey explained a caseworker was not assigned to assist Ruben in California.

Sharkey admitted D.B.T. told him he wanted to get to know Ruben, and Sharkey initially stated he believed it was in D.B.T.'s best interest to have a relationship with Ruben. However, when asked again why he believed termination was in D.B.T.'s best interest, Sharkey responded

> Because the child support that has been given is very few [sic]. It's not consistent. It's also once he had the phone number in the past couple of weeks or week that he has not made contact since then, to my knowledge. And I've been in contact with the caregivers. It's also that the -- that he does not want to be separated from his siblings. His current siblings. And he's already been subjected to enough. Enough of all the other domestic violence, enough of everyone choosing their needs over his. And that could hold true at this time for Mr. Torres.

Ruben testified he maintained a full-time job as a restaurant manager in California and he is the primary caregiver for his two children, one of whom is autistic. He explained that although he was at the hospital when D.B.T. was born, he did not believe D.B.T. was his child until his paternity was established in a proceeding filed by the Attorney General. He admitted his previous

child support payments were sporadic, but testified he did the best he could when he struggled financially.

Ruben also testified he wanted the opportunity to develop a relationship with D.B.T., was ready and willing to have D.B.T. live with him, and would financially support D.B.T. if the trial court found it was in D.B.T.'s best interest. Ruben testified he and Enedina agreed to "taking it slow" in developing Ruben's relationship with D.B.T, and they had discussed D.B.T. and Enedina visiting him in California. Ruben also explained he did not reach out to D.B.T. because he was told not to contact D.B.T. unless he went through the court and completed classes.

Ruben stated he did not attend parenting classes because he did not have any help in trying to find classes, and the Department did not provide him with any resources or a list of classes. He admitted on cross-examination that he has a computer with Internet access and could have found parenting classes had he had the time and guidance. Ruben testified he called Sharkey for assistance a few times, but they missed each other's calls.

*Analysis*

It is undisputed that D.B.T. expressed his desire to develop and maintain a relationship with his father, Ruben. The evidence also established D.B.T. was placed in the care of his maternal grandparents, and removed from the dangers to which Jose (who was in prison at the time of trial) and Adriana exposed him. Furthermore, Ruben testified the maternal grandmother's plan for D.B.T. was to have him gradually develop a relationship with Ruben. The State's contention that D.B.T. had bonded with his maternal grandparents, in light of their plans for D.B.T. and Ruben's desire to maintain his parental rights in the absence of custody, does not show how Ruben maintaining parental rights would interfere with D.B.T.'s bond with his maternal grandparents or their ability to meet D.B.T.'s needs.

The State argues the evidence that Ruben "sporadically" paid child support and, based on Sharkey's testimony, missed "all of [D.B.T.'s life]" are omissions supporting the trial court's finding that termination is in D.B.T.'s best interest. However, Sharkey admitted Ruben spent up to six months in D.B.T.'s life and that Adriana interfered with Ruben's contact with D.B.T. thereafter. Sharkey also admitted telling Ruben not to contact D.B.T. because it was not in D.B.T.'s best interest to do so. Furthermore, Sharkey admitted Ruben consistently paid child support after the Department filed its petition in this case and Ruben explained his sporadic payment of child support was due, at least in part, to his financial struggles.

Although we do not reach Ruben's issue that the trial court improperly granted the Department's trial amendment, we note Ruben was brought into the suit on grounds the Department admitted it had no evidence to support. It was only after the Department filed its petition in this case that Ruben was ordered to complete a family service plan, one part of which was to complete a parenting course. Ruben admitted he did not complete the court-ordered parenting course, and his parental rights were terminated on that ground.

While a ground for termination might also be probative of a child's best interest, it is not in this case. When termination is based on a parent's failure to complete a parenting course when the child is removed from the parent because of *that* parent's abuse or neglect, the failure to complete the course might be significantly probative of a child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(1)(O) (West 2014); *In re O.N.H.*, 401 S.W.3d at 684. Here, however, the State admittedly had no evidence that Ruben knew about Jose's drug abuse or that D.B.T. was exposed to domestic violence between Jose and Adrianna. The State presented no evidence about Ruben's parenting skills that would make his failure to complete a parenting course probative of D.B.T.'s best interest.

### CONCLUSION

The trial court's best-interest finding is not supported by clear and convincing evidence. The evidence established two compelling *Holley* factors in Ruben's favor: Ruben and D.B.T.'s clear desire to develop and maintain a father-son relationship and Enedina's hope to develop a bond between D.B.T. and Ruben. The State presented no evidence of Ruben's parental abilities or lack thereof, whether he would benefit from any programs, or how maintaining his parental rights might negatively affect D.B.T.'s emotional and physical needs. The sole factors upon which the State presented evidence was general testimony about Ruben's sporadic child support payments and not maintaining contact with D.B.T. On this record, the evidence is insufficient for a factfinder to reasonably form a firm belief or conviction that termination of Ruben's parental rights is in D.B.T.'s best interest. Therefore, in the interest of justice, we reverse the trial court's judgment and render judgment denying the Department's petition to terminate Ruben's parental rights.

Luz Elena D. Chapa, Justice