

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00063-CV

In the Interest of **Z.R.M.**, Child

From the 38th Judicial District Court, Medina County, Texas
Trial Court No. 13-11-22140-CV
The Honorable Cathy Morris, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:     Karen Angelini, Justice
             Marialyn Barnard, Justice
             Jason Pulliam, Justice

Delivered and Filed:  July 8, 2015

AFFIRMED

Marla appeals the trial court's order terminating her parental rights to her child, Ryan, arguing that the evidence was legally and factually insufficient to support a finding that termination was in the child's best interest.[1] We affirm.

### BACKGROUND

The Texas Department of Family Services became involved in this case in November 2013, after receiving a neglectful supervision referral about Ryan. The referral alleged that Ryan, who was three years old, looked malnourished and was sometimes left outside unsupervised or with a neighbor who used drugs. The referral also alleged that Marla and her boyfriend were daily drug

---

[1]We use fictitious names to refer to the mother and the child to protect the child's identity. *See* TEX. R. APP. P. 9.8(b)(2).

users and that they used drugs in the child's presence. An investigation into these allegations culminated in the Department filing a petition seeking protection of the child, conservatorship, and termination of parental rights. The Department obtained an order for Ryan's emergency removal, and Ryan was removed from Marla's home. Initially, Ryan was placed with his maternal grandmother; he was later placed with a foster family. After Ryan's removal, the Department developed a family service plan for Marla, which required, among other things, that Marla participate in drug treatment, submit to random drug testing, and participate in visitation with Ryan. Marla completed drug and alcohol assessment, outpatient drug treatment, and parenting classes in accordance with the plan. Marla participated in anger management counseling. Marla attended many of her scheduled visits with Ryan. However, sometimes Marla would show up for visits thirty or forty minutes late. There were also occasions when Marla failed to show up for visits at all. Even after Marla completed drug treatment, she tested positive for heroin and for cocaine.

The Department proceeded to terminate Marla's parental rights.[2] The case was tried to the court in February 2015. At trial, Marla was represented by counsel, but did not appear in person. The Department presented testimony from two law enforcement officers, one of its investigators, one of its caseworkers, and a counselor who had provided services to Marla. After hearing this evidence, the trial court terminated Marla's parental rights on grounds that Marla (1) had knowingly placed or knowingly allowed Ryan to remain in conditions or surroundings that endangered his physical or emotional well-being; (2) had engaged in conduct or knowingly placed Ryan with persons who engaged in conduct that endangered his physical or emotional well-being; (3) had had her parent-child relationship terminated with respect to another child  based on a

---

[2]The parental rights of Ryan's father were also terminated, but Ryan's father did not appeal.

finding that her conduct violated one of the formerly-mentioned grounds; and (4) had used a controlled substance in a manner that endangered Ryan's health or safety and either (a) failed to complete a court-ordered substance abuse treatment program, or (b) after completion of the court-ordered substance abuse treatment program continued to abuse a controlled substance. In addition, the trial court found that termination of Marla's parental rights would be in Ryan's best interest. Marla appealed.

## PARENTAL TERMINATION REQUIREMENTS

Termination of parental rights under section 161.001 of the Texas Family Code requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in section 161.001(1)(A)-(T) and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1),(2) (West 2014); *In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The same evidence proving acts or omissions under section 161.001(1) of the Texas Family Code may be probative of the child's best interest. *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). A best interest analysis may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In the Interest of D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The trier of fact may measure a parent's future conduct by his or her past conduct and determine that it is in the child's best interest to terminate parental rights. *In the Interest of O.N.H. and D.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *id*. However, the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest. *O.N.H.*, 401 S.W.3d at 684.

**STANDARDS OF REVIEW**

A review of legal sufficiency in a case with a clear and convincing evidence standard requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a strong belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* If we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* Evidence is factually sufficient under a clear and convincing standard if "a factfinder could reasonably form a firm belief or conviction about the truth of the [Department's] allegations." *C.H.*, 89 S.W.3d at 25. We must consider whether disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

**THE EVIDENCE**

*Felipe Ramon*

At trial, Felipe Ramon, a City of Uvalde police officer, testified that he was very familiar with Marla because of a disturbance and an on-going narcotics investigation in which Marla was suspected of drug smuggling. In October 2013, about a month before the neglectful supervision

report that sparked this case, Ramon contacted Marla to ask her some questions. When Ramon learned that Marla had active arrest warrants, he arrested her. At the time of the arrest, Ramon advised Marla to give up any controlled substances in her possession immediately so she would not be charged with the more serious offense of drug possession in jail. Marla, who was angry that she was being arrested, did not respond.

### Crystal Meyer

Crystal Meyer, a correctional officer at the Uvalde County Detention Center, testified that she was working at the jail when Ramon brought Marla in on the active arrest warrants. When Marla arrived at the jail, Meyer found "a small green baggie with a rock-like substance" in Marla's clothing. Testing showed the substance was heroin. Marla was charged with possession of a controlled substance.

### Valeria Zamarripa

Valeria Zamarripa, a Department investigator, testified that the Department became involved in this case in November 2013, after receiving a report of neglectful supervision concerning Ryan. In response to the report, Zamarripa visited Marla's home and noted that it was "messy" and contained a minimal amount of food. Because of the home's untidiness and the lack of food, the caseworker advised Marla that she would be making random home visits. Marla told Zamarripa that she was not doing drugs. Nevertheless, Zamarripa asked Marla and her boyfriend if they would submit to oral swab drug tests, and they said they would. Both assured Zamarripa that the drug tests would come back negative. Oral samples were collected from Marla and her boyfriend and sent to a lab.

Zamarripa subsequently reviewed Marla's history with the Department, which showed that Marla had previously given birth to two children who had tested positive for controlled substances at birth. These children were both born premature and there was no record of Marla receiving

prenatal care for them. Marla's parental rights had been terminated as to these two children, and also as to a third child.[3] In the past, Marla did not cooperate with the Department's services, and she failed to maintain contact with the Department. Furthermore, in 2009, while Marla was pregnant with Ryan she tested positive for synthetic marijuana. Zamarripa also learned that Marla and her current boyfriend had criminal records. Shortly thereafter, Zamarripa received the results from Marla and her boyfriend's most recent drug tests. Each of these drug tests were positive for cocaine.

Five days after her initial contact with Marla, Zamarripa returned to Marla's home. No one was present and there was now a padlock on the front door. Over the course of the next two days, Zamarripa attempted to contact Marla by returning to her home and by calling Marla's relatives. When efforts to locate Marla and Ryan failed, the Department filed its petition for protection of a child, conservatorship, and termination of parental rights. The Department obtained an order for Ryan's emergency removal. Thereafter, Zamarripa returned to Marla's home—now with law enforcement—to remove Ryan from the home. Zamarripa knocked on the door, and fifteen minutes elapsed before Marla responded. Marla opened one of the windows to the back of the home, stating that she had lost the key to the padlock that was on the front door. Marla then climbed out of the window to come to talk to Zamarripa. Law enforcement brought Ryan out of the home. When Zamarripa informed Marla of her positive drug test result, Marla admitted that she had rubbed cocaine on her gums, but stated she had done so because her teeth were hurting. When Zamarripa told Marla that the use of cocaine would not be recommended by her doctors, Marla responded that "it was just a little bit of cocaine." Marla admitted to Zamarripa that she had used heroin and marijuana in the past, and that she had chosen drugs over her children in the past. Marla

---

[3]The termination orders, which were admitted into evidence at trial, were dated September 22, 2005, and July 30, 2007.

informed Zamarripa that Ryan needed surgery for his teeth; however, Marla was unable to provide Zamarripa with the name of Ryan's dentist. Marla asked that Ryan be placed with his maternal grandmother.

### *Jacquelyn Ramsay*

Jacquelyn Ramsay, a Department caseworker, testified that, during the course of this case, Marla changed residences seven times and was involved with two or three different boyfriends. The first time Ramsay had contact with Marla was in December 2013, after the Department had been appointed Ryan's temporary managing conservator. Marla telephoned Ramsay in a panic and said she was unable to make her visit that day because she was having car trouble. A few days later, Marla telephoned Ramsay again to tell her that she had changed her phone number and her living arrangements. Marla was now living in a hotel in Hondo, Texas, and she provided Ramsay with the address.

In January 2014, Marla and Ramsay met in person to go over the family service plan. By this time, Marla had moved to Uvalde, Texas. Ramsay and Marla reviewed the service plan, and Marla signed it. Marla and Ramsay talked. Marla was no longer involved with Z.Z., the man who was her boyfriend when Ryan was removed. Marla now had a new boyfriend, N.L. In late February 2014, Ramsay went to Marla's home early in the morning. There were four men coming out of Marla's house. One of the men was Marla's former boyfriend, Z.Z. Several of the men made inappropriate comments to Ramsay. Marla told Ramsay that she and N.L. had broken up. Once Ramsay was inside the house, Marla showed Ramsay around. When Ramsay looked in the medicine cabinet, she found pain medications prescribed to two other people. Marla admitted that she was taking these prescription medications, and Ramsay advised her that this was illegal.

At a hearing in April 2014, Ramsay learned that Marla had recently been arrested. Marla and N.L. were fighting in the street. Both Marla and N.L. were arrested, but eventually the charges

were dropped. Marla subsequently moved to Crystal City, Texas. In July 2014, Ramsay went to a residence in Crystal City to talk to Marla. Upon arriving at the residence, Ramsay saw an older model vehicle parked outside the house with tires and debris inside it. Ramsay also saw beer cans and a beer box in the trash can, and men's clothing hanging over the side of the deck. Marla was not home. When Ramsay later asked Marla about this, Marla explained that her landlord, H.S., was paying her to clean out the house and to do his laundry. H.S. was also allowing her to sell items in the house so she could make money. Marla stated that the beer cans were old, but Ramsay could tell that they were not. Marla never allowed Ramsay to come inside this house. Although Ramsay suspected that H.S. was Marla's boyfriend, she did not ask him to engage in services.

Ramsay learned that Marla has health problems, including a heart condition that required her to use oxygen strips. However, most of the times that Ramsay saw Marla, she was not using her oxygen strips.

Ramsay was notified that Marla completed drug and alcohol assessment, outpatient drug treatment, and parenting classes. Ramsay also received notes from a counselor concerning Marla's anger management sessions. Ramsay acknowledged that Marla appeared to be making progress; however, she emphasized that engaging in services was not enough; a service plan is intended to show that a parent can provide a safe and stable home for her child. According to Ramsay, a parent must learn from the services and must meet the goals of the service plan. Ramsay felt that Marla was not meeting the goals of her service plan in part because Marla continued to test positive for drugs.[4] Ramsay did not believe that Marla had met the goals of her service plan simply because she completed some of the tasks on it.

_____

[4]The Permanency Progress Report filed on January 20, 2015, indicated that Marla had completed outpatient drug treatment on September 22, 2014, and had tested positive for heroin on October 30, 2014, and cocaine on January 9, 2015.

Marla's visits with Ryan started in December 2013. During these visits, Marla acted appropriately with Ryan. Nevertheless, Marla missed about one visit per month, except for May, August, and October 2014. In November 2014, she not only missed one visit but was thirty minutes late to another visit. In December 2014, she was at least forty minutes late to all of her visits. Marla's visits were eventually reduced from once a week to twice a month.

Ramsay testified about one occasion when Marla failed to show up for a scheduled visit. When it was time for Ryan to leave, he became angry and ran to the bathroom. Ryan blamed his grandmother, who had brought him to the visit, and told his grandmother that they needed to wait longer for his mother to show up. Ramsay also testified that Ryan's teacher reported that she could tell when Ryan was scheduled to visit his mother because he would have "an accident in his pants" at school. When Ryan first came into the Department's care, most of his teeth had to be removed due to decay and a gum infection. The teeth that were removed, which were baby teeth, were replaced with false teeth. Ryan was placed on antibiotics to treat the gum infection. When Ramsay spoke to Marla about Ryan's severe dental issues, Marla failed to see it as a problem, indicating that the teeth of all young children were like Ryan's. During the course of the case, Marla never provided Ramsay with the names of Ryan's pediatrician and dentist.

Initially, Ryan was placed in the home of his maternal grandmother. When the Department learned that Ryan's grandmother had left him at home unsupervised and had allowed him to ride in her car without a seatbelt even after a warning, Ryan was placed with a foster family. Ramsay discussed the reasons for Ryan's move with Marla, who was not concerned about the lapses in Ryan's care. Instead, Marla was angry that Ryan was no longer in her mother's care.

According to Ramsay, Ryan was doing exceptionally well in the foster home. Ryan called his foster parents "mom" and "dad" and was very attached to them. Ryan had no current health problems and was not in need of any kind of therapy. Ryan was doing well in school.

Ramsay also testified that Marla had told Ramsay that she would like Ryan be placed with "family," that is, either with the couple that had adopted her other children or with one of her relatives. Marla provided Ramsay with the names of family members who might be able to care for Ryan. At the beginning of the case, the Department was in contact with the couple that had adopted Marla's other children to explore the possibility of adopting Ryan. There were some delays when the couple did not complete the required training. However, at the time of trial, this placement was still an option. The Department had also been in contact with a relative of Ryan's father who had expressed an interest in having Ryan placed in her home.

In Ramsay's opinion, termination of Marla's parental rights was in Ryan's best interest. Ramsay believed that Marla's history of assaultive and drug behavior posed a risk to Ryan. Ramsay also believed that Marla could not meet Ryan's emotional needs now or in the future. Ramsay did not believe that Marla had a stable home, nor did she believe that Marla had met the goals of her psychological treatment.

### *Domingo Davalos*

Domingo Davalos, a licensed professional counselor, testified that he provided anger management and individual counseling to Marla. The counseling was precipitated by this case. Davalos had six one-hour counseling sessions with Marla. Davalos understood that Marla had had ongoing drug problems since at least 2004. And, in addition to anger management problems, Marla suffered from anxiety and depression and had trouble with pain management. At her first session, on August 19, 2014, Marla reported to Davalos that nineteen days earlier she had been in a fight with a neighbor, and she had sent the neighbor to the hospital. During the sessions, Marla actively participated in the discussions; she went above and beyond during the therapy sessions. Davalos helped Marla develop techniques for dealing with her anger and strategies for handling situations in which she became angry. Marla would really talk about what she was learning and how she was

applying it. Marla told him of two incidents in which she refrained from getting in heated arguments with people as she would have done in the past. According to Davalos, Marla had made progress in dealing with her anger. However, Davalos acknowledged that he was not in a position to make a recommendation about whether a four-year-old child should be placed with Marla.

### ANALYSIS

Marla does not argue the evidence is legally and factually insufficient to support the trial court's findings that she committed one or more of the acts or omissions listed in section 161.001(1) of the Texas Family Code. Instead, Marla's sole argument is that the evidence was legally and factually insufficient to support a finding that termination of her parental rights was in Ryan's best interest.[5]

There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *In the Interest of H.R.*, 87 S.W.3d 691, 700 (Tex. App.—San Antonio 2002, no pet.). In determining the child's best interest, courts consider the following non-exclusive factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a

---

[5]To the extent that Marla's brief raises complaints about Ryan's removal, we do not address these complaints because they are not proper in the context of an appeal from a final order terminating parental rights. *See In the Interest of D.W.*, No. 01-13-00880-CV, 2014 WL 1494290, at *3 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (declining to address issues related to temporary orders when the trial court had rendered a final order); *L.F. v. Dep't of Family & Prot. Serv.*, No. 01-10-01148-CV, 2012 WL 1564547, at *14 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (recognizing that an issue concerning the child's emergency removal was moot when the trial court had already rendered a final order).

proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also C.H.*, 89 S.W.3d at 27.

As a threshold matter, Marla complains that there was no evidence as to some of the *Holley* factors. However, this fact—in and of itself—does not demonstrate that the evidence was legally and factually insufficient to support a finding that termination was in Ryan's best interest. There is no requirement that evidence be presented as to each of the *Holley* factors. *C.H.*, 89 S.W.3d at 27; *H.R.*, 87 S.W.3d at 700.

In reviewing the sufficiency of the evidence to support the best interest finding, we evaluate the evidence as it applies to the *Holley* factors that are pertinent in this case. At the time of trial, Ryan was only four years old. As often is the case with young children, no direct evidence was presented concerning Ryan's wishes. As to Ryan's physical and emotional needs now and in the future, the evidence showed that Ryan had serious dental problems when he was taken into protective custody. Virtually all of his teeth needed to be pulled and replaced with false teeth. Ryan also suffered from a gum infection and had to be prescribed antibiotics to cure this infection. When the caseworker discussed Ryan's dental issues with Marla, she failed to see them as a problem. The evidence also showed that Marla failed to attend each and every visitation scheduled with Ryan. At trial, Marla presented no explanation or excuse for her failure to attend some visits, or for her extremely tardy arrival for other visits. Marla's failure to attend visits was distressing for Ryan. On one occasion, Ryan become angry and upset when Marla failed to show up for a visit. Ryan would also have "accidents" in anticipation of scheduled visits with his mother. From this evidence, the trial court could have found that Marla was not caring for Ryan's physical and emotional well-being in the present and could not appropriately care for Ryan's physical and emotional well-being in the future.

Drug-related conduct is a significant factor to which a factfinder can give great weight in evaluating the best interests of the child. *Dupree v. Texas Dept. of Prot. & Regulatory Serv.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). A factfinder can form a firm conviction or belief that termination of parental rights is in a child's best interest from facts showing a parent's frequent and long-term use of drugs. *Toliver v. Texas Dept. of Family and Prot. Serv.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (explaining that the trial court could have found termination of parental rights was in the child's best interest when, among other things, parent tested positive for cocaine almost immediately after completing an inpatient treatment program, was discharged from group treatment after exhibiting severe behavior problems, and then left treatment altogether). In this case, there was substantial evidence that Marla was currently engaged in drug use and had been for a very long time. Marla had given birth to two other children who had tested positive at birth for controlled substances. Marla's parental rights as to two children were terminated in 2005, and her parental rights as to another child were terminated in 2007. Marla's drug use was a factor in both termination cases. At the beginning of this case, in November 2013, Marla tested positive for cocaine. On this occasion, Marla minimized the significance of her drug use, explaining that she had only rubbed a small amount of cocaine on her teeth to help her deal with pain. Even after Marla completed the drug treatment ordered in this case and understood that her drug use was jeopardizing her relationship with Ryan, Marla still tested positive for cocaine and heroin. From this evidence, the trial court could have found that Marla's long-term drug use posed a danger to Ryan's physical and emotional well-being in the present and would pose a danger to Ryan's physical and emotional well-being in the future.

As to Marla's parental abilities, Ramsay, the caseworker, testified that during their visits, Marla's interaction with Ryan was appropriate. But on multiple occasions Marla either arrived late to her visits with Ryan, or she failed to appear at all. The trial court also could have considered

Marla's past neglect of Ryan when considering Marla's parental abilities. When Ryan came into the Department's care, he had serious dental issues that required immediate treatment. Additionally, Marla was never able to provide the Department with the names of Ryan's dentist or his pediatrician. There was other evidence that Marla engaged in acts or omissions that indicated that her relationship with Ryan was not a proper one. When Ryan was moved from his grandmother's care to foster care, Ramsay explained the reasons for the move to Marla. Marla was told that the grandmother had left Ryan at home unsupervised and had allowed Ryan to ride in a car without a seatbelt. According to the caseworker, Marla expressed no concern about these lapses in care. Ramsay also testified that Marla never brought Ryan anything special from home like a stuffed animal or a blanket or clothing; Marla brought Ryan toys, but they were new toys, rather than special toys from home. Marla never asked Ramsay if there was anything special that Ryan needed.

As to the stability of Marla's home, the evidence showed that Marla moved approximately seven times during the pendency of this case. Marla argues that her moving to a new residence is not evidence of any danger to Ryan. However, the trial court could have reasonably found that Marla's frequent moves, in combination with other evidence, indicated that her living situation was unstable. Marla lived with two or three different boyfriends during the course of this case, and while this case was pending, Marla and one of her boyfriends were arrested for assaulting one another. And, significantly, Marla refused to allow Ramsay to see the inside of the last home in which she lived. From this, the trial court could have inferred that the home was not appropriate for a child. Additionally, the caseworker testified that even though Marla had three cell phones, it was sometimes very difficult to contact her. In arguing in favor of the stability of her home, Marla asserts in her brief that the evidence shows that she was always employed. The record, however, indicates this issue was disputed. There was some evidence that Marla received disability

payments and was otherwise unemployed. There was also some evidence indicating that Marla supplemented her income by picking lettuce in the fields.

As to the stability of the Ryan's current home and any proposed placement, the evidence shows that Ryan was living in a foster home where he was doing well. Ryan was attached to his foster parents, was doing well in school, and at present had no health problems. At the time of trial, the Department was exploring several permanent placement options for Ryan, including a placement with the family that had adopted his older siblings as well as a placement with one of his paternal relatives.

The only direct evidence on the child's best interest was from Ramsay, who testified that, in her opinion, termination of Marla's parental rights was in Ryan's best interest. Ramsay did not believe that Marla could provide Ryan a stable home environment. Ramsay believed that Marla's history of assaultive and drug behavior posed a risk to Ryan. Ramsay also believed that Marla could not meet Ryan's emotional needs now or in the future. On the other hand, Davalos testified that Marla actively participated in her anger management sessions with him, and he believed that she was making progress in this area. However, acknowledging his limited role in this matter, Davalos offered no opinion about whether Ryan should be placed with Marla.

Based on this evidence, we conclude that the trial court could have formed a strong belief or conviction that termination of Marla's parental rights was in Ryan's best interest. We, therefore, hold the evidence is legally and factually sufficient to support the trial court's finding that termination of Marla's parental rights was in Ryan's best interest.

## CONCLUSION

The trial court's termination order is affirmed.

Karen Angelini, Justice