

## Fourth Court of Appeals

### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00182-CV

**IN THE INTEREST OF D.L.A. Jr.**, D.L.A.R., B.B.R., B.L.A.R., and J.R.

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2016PA01942
Honorable Richard Price, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Luz Elena D. Chapa, Justice
                 Irene Rios, Justice

Delivered and Filed:  September 18, 2018

MOTION TO WITHDRAW DENIED; AFFIRMED

This is an accelerated appeal from the trial court's order terminating parental rights. We affirm the order.

### BACKGROUND

The Texas Department of Family and Protective Services filed an original petition in September 2016, for conservatorship of five children. The Department sought to terminate the parental rights of the children's mother, Doris[1], and of their fathers. The petition alleged that Dan is the father of D.L.A. Jr. (born in 2005), Bill is the father of B.B.R. (born in 2009), B.L.A.R. (born in 2010), and J.R. (born in 2016), and the father of D.L.A.R. (born in 2008) is unknown.

---

[1] To protect the identity of the minor children, aliases are used to refer to the parents and foster parents, and the children are referred to by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2017); TEX. R. APP. P. 9.8(b)(2).

The Department's affidavit seeking emergency removal of the children asserted the family had been receiving a wide variety of family based safety services for almost a year, since October 2015, as a result of physical abuse of the children and domestic violence between Doris and Bill. The Department sought temporary sole managing conservatorship of the children because Doris and Bill continued to place the children at risk of physical and emotional harm, the referrals for abuse and neglect were escalating, and there was suspicion of sexual abuse. The trial court granted the motion for emergency removal. Doris and Bill both signed plans of service. Dan was located at the federal correctional facility in Wilmer, West Virginia, and was served in March 2017.

The case proceeded to a bench trial, which was held over a period of five days in February and March 2018, eighteen months after the case was filed. Doris appeared in person and Dan appeared from prison by video conference. Bill's attorney presented an irrevocable affidavit of voluntary relinquishment of Bill's parental rights as to the children B.B.R., B.L.A.R., and J.R., and asked that his rights be terminated on that ground. Bill rested, the trial court excused his attorney, and Bill did not appear for the remainder of the trial.

After trial, the court signed an order terminating the parental rights of Doris, Dan, Bill, and the unknown father and designating the Department as the managing conservator of all the children. Doris, Dan, and Bill each appeal the order.

## STANDARD OF REVIEW

An order terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2017). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for

the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable credibility determinations. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam).

A legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* The evidence is factually insufficient "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.*

### BILL'S APPEAL

The trial court terminated Bill's parental rights as to B.B.R., B.L.A.R., and J.R., after finding by clear and convincing evidence that Bill executed an irrevocable affidavit of relinquishment of parental rights and that termination of Bill's rights is in the children's best interest. *See.* TEX. FAM. CODE ANN. § 161.001(b)(1)(K), 161.001(b)(2). Bill expressly stated in his affidavit that termination of his rights is in the best interest of the children.

Bill's court-appointed appellate counsel filed a brief and a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), in which he asserts there is no non-frivolous ground for appeal. *See In re P.M.*, 520 S.W.3d 24, 27 n.10 (Tex. 2016) (per curiam); *In re R.R.*, No. 04-03-00096-CV, 2003 WL 21157944, at *4 (Tex. App.—San Antonio May 21, 2003, no pet.) (mem.

op.) (applying *Anders* procedure in appeal from termination of parental rights). Counsel provided Bill copies of the brief and motion, and Bill was informed of his right to review the record and to file a pro se brief. Bill did not request the record or file a brief. The State waived its right to file a brief.

After reviewing the record and counsel's brief, we agree the appeal is frivolous and without merit. *See In re K.S.L.*, 538 S.W.3d 107, 112 (Tex. 2017). We therefore affirm the trial court's order terminating the parent-child relationship between Bill and the children B.B.R., B.L.A.R., and J.R. However, we deny counsel's motion to withdraw because counsel does not assert any ground for withdrawal other than his conclusion that the appeal is frivolous. *See In re P.M.*, 520 S.W.3d at 27; *In re A.M.*, 495 S.W.3d 573, 583 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).[2]

### DORIS'S APPEAL

The trial court found that termination of Doris's parental rights as to all five children was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). In addition, the court found that Doris executed an irrevocable affidavit of relinquishment of her parental rights as to the youngest child, J.R. *See id.* § 161.001(b)(1)(K). The court found Doris knowingly endangered the other four children and failed to comply with court-ordered provisions of the family service plan. *See id.* § 161.001(b)(1)(D), (E), & (O). On appeal, Doris does not contest the statutory grounds for termination, but argues only that there is legally and factually insufficient evidence to support the trial court's finding by clear and convincing evidence that termination of her parental rights is in the children's best interest.

---

[2] Counsel's duty to his client extends through the exhaustion or waiver of all appeals, including the filing of a petition for review in the Texas Supreme Court. *See* TEX. FAM. CODE ANN. § 107.016(3)(B)(2) (West Supp. 2017); *In re P.M.*, 520 S.W.3d at 27. After this court has rendered its decision, appointed counsel's obligations to his client may be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief. *Id.* at 27-28 & n.14.

***Best Interests of the Children***

Under Texas law, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A court must also presume that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2017). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d at 27-29. And, in determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. These factors include:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing: minimally adequate health and nutritional care; care, nurturance, and appropriate discipline; guidance and supervision consistent with the child's safety; a safe physical home environment; protection from repeated exposure to violence even though the violence may not be directed at the child; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*See* TEX. FAM. CODE ANN. § 263.307(b). In addition, a court may consider evidence about the desires of the child; the emotional and physical needs of the child now and in the future; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *In re C.H.*, 89 S.W.3d at 27. These lists of considerations are not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* at 28. And, although the mere fact that an act or omission occurred in the past does not establish that termination is currently in the child's best interest, a parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d at 684.

### The Evidence

Doris's therapist, Patricia Boone, testified at trial that these children were raised in a "quagmire [of] mental, emotional, physical, and sexual abuse" and they suffered trauma over an extended period of time. Dan, the father of D.L.A. Jr., was charged with assaulting Doris when she was pregnant with D.L.A. Jr., in 2005. Doris testified her history with the Department goes

back to 2008, when she met Bill and there were allegations of abuse and neglect of then three-year-old D.L.A. Jr. Doris testified that is when the abuse started and that Bill was the perpetrator.

Doris remained with Bill for the next ten years and had four more children, even though he was abusive both to her and the children. Doris testified he was both physically abusive and controlling. She related that Bill insisted on taking and picking her up from work to make sure she was not going anywhere or talking to anyone. If he did not pick her up from work, he would make her remove her underwear when she got home so he could check it. He would also watch her shower to make sure she was not doing anything inappropriate. He would task the children to spy on her.

Doris told her therapist that Bill would walk around the house naked at times and make the boys do so as well, and that she discovered Bill and the youngest boy, B.B.L.R., in bed together, naked. She stated that Bill would shower with B.B.L.R. until the Department's removal, when the child was seven. Doris also reported that Bill would pinch the genitalia of the boys and the family's pets.

Doris testified she was aware the children were being physically and possibly sexually abused by Bill, but denied that she has ever hit any of her children. She testified she allowed Bill to continue to abuse the children because if she had intervened to protect them, Bill would have beaten her.

The family began receiving Family Based Safety Services from the Department in October 2015, due to concerns about the ongoing physical violence between Doris and Bill and abuse and neglect of the children. The Department's family based services case worker, Keely Burtscher, testified about a wide variety of services that were offered and provided to the family during this period. The reasons for the October 2015 referral and the continued reports of abuse and neglect

while the family was receiving services were summarized in the report of the psychologist who

evaluated Doris. The report, which was admitted into evidence, stated in part:

> Although there is an earlier history with the department, referral information indicates that the situation that led to the children's being taken into state custody followed a referral that was received in October, 2015, alleging physical abuse of [D.L.A. JR.] by his stepfather, [Bill]. The referral information indicates that in May, 2015, [D.L.A. JR.] had been observed to have a swollen lip and two broken front teeth. He reported that the injury was caused by physical discipline by [Bill]. He had not been listening to his stepfather, and was spanked on the buttocks with a paddle. When he turned around [Bill] hit him in the face, causing the injury. His mother knew of the situation but had not taken [D.L.A. JR.] to the dentist immediately. When he did have an examination, he was told that the teeth could not be replaced until he was a teenager. [D.L.A.R.] was not at school. [D.L.A. JR.] stated that his brother had been kept home as a consequence for misbehavior. His stepfather stated that he did not deserve to go to school. [D.L.A.R.] confirmed that [Bill] had spanked him with a paddle on the buttocks and back, and that he has been pinched on his legs and ears. He also indicated that his mother used physical discipline with a belt. [B.B.R.] also described his father as pinching him and his brothers, and getting spankings.
>
> In October, 2015, neglectful supervision of [B.B.R.] was reported. He had been sent to the nurse's office with elbow pain, and was observed to have a burn that he sustained accidentally when he tried to cook a tortilla for himself. In April, 2016, [D.L.A. JR.] was alleged to be "doing nasty things" to his brothers. He allegedly was taking off his clothes, dancing on the table, and having inappropriate sexual contact by touch. [Doris] was reported to be present, and allowed the behavior.
> . . .
>
> In May, 2016, physical abuse of the children by their mother was reported. They were alleged to be hit daily with a belt and 2 x 4 boards by their mother, leaving bruises on the bottoms of the children. She was also alleged to make rejecting messages toward the children. She was reported to treat her children "like animals." [Doris] was reported to be violent to [Bill]. She had applied some substance on [Bill's] eyes that required him to be hospitalized and to possibly lose his vision. Other inappropriate discipline practices that were used by their mother were reviewed (e.g., sitting on the child as a consequence for accidentally stepping on her foot, having the children kneel for hours, spankings with a belt, paddle, or hand).
>
> In June, 2016, physical abuse of the children was reported. All four boys and their mother were staying at the Battered Women's Shelter in San Antonio. [Doris] had been observed by staff to be rough with the children (e.g., hitting and slapping their faces, punching their arms). The children were heard screaming, and were crying as they exited the bathroom. The children said their mother is mean and hits them. Physical abuse was alleged in July, 2016. A mental health professional met with

[Doris] to discuss [D.L.A. JR.'s] behavior. During the session, [D.L.A. JR.] dug his nails into an open wound on [D.L.A.R.'s] arm. [Doris] reported that there were scratches all over [D.L.A.R.'s] body due to the boys' aggression and [D.L.A.R.'s] attempt to harm himself. Neglectful supervision was reported by staff at the Battered Women's Shelter in August, 2016. It was reported that there were daily complaints by staff and residents about [Doris] and her sons. The boys were demonstrating aggression toward one another, and other forms of misbehavior. They were observed to be unattended during the night. When confronted about her lack of supervision of the children, [Doris] denied the allegations. Due to the ongoing risk factors the children were taken into state custody.

Burtscher testified that the four boys "were wild" and regularly "lashed out at each other." Doris, despite having completed a parenting class, was unable to control them and would yell at them and hit them in order to get their attention. She testified the boys all told her they were afraid to be with their mom and that D.L.A. Jr. did not want to be around his brothers. She testified all of the boys were exhibiting problematic behaviors. The youngest child, J.R., was born in August 2016, and had significant medical issues. The Department filed this suit in September 2016 and obtained temporary conservatorship of all five children.

After suit was filed, Doris received a psychological evaluation from clinical psychologist Ann Hernandez, PhD. She diagnosed Doris with major depressive disorder and "unspecified personality disorder with antisocial traits," which Hernandez explained was primarily a concern that Doris had a "lack of empathy for the children and their experiences." Hernandez testified Doris was unable to understand the connection between her own behavior, her discipline of the children or lack thereof, and the trauma and behavioral issues the children were experiencing. She recommended Doris engage in individual therapy, but was concerned that due to her lack of insight, Doris may have trouble succeeding at therapy. She testified that until Doris addresses and resolves the underlying issues, she will not able to act in a protective fashion and the children would be in danger if they were returned to her.

Doris then began individual counseling sessions with Patricia Boone and was still in counseling at the time of trial. Boone testified that Doris had only recently begun to recognize that the environment she and her children had been in was a bad one. But Doris did not yet understand how she contributed to that environment. Because Doris still has not acknowledged her role in the harm done to the children, they have not yet started trying to address how Doris can protect them. Boone testified Doris needs to accept her responsibility before she can make the changes necessary to properly parent. Boone stated that in her opinion Doris's emotional age is in the twelve-to-fourteen year old range and she was parenting the children from that perspective. Even though she had completed parenting classes, received individual counseling provided by the department while the children were still in her care, and been in counseling with Boone since November 2017, Doris had not internalized the skills needed to protect the children.

Boone testified that while this case was pending, Doris moved in with a new partner who has a criminal record, and that Doris had become pregnant and had another child. Boone stated that these were bad choices that contributed to Doris's instability and interfered with her ability to focus on becoming a better parent to her other children. Boone also testified that Bill continues to pursue Doris, and Boone believes Doris remains at risk for returning to the abusive relationship with Bill in the event her current relationship ends.

Boone testified that Doris is engaged in counseling, is motivated, is making progress, and has the capacity to make further progress. In her opinion, if Doris continues her therapy and continues to progress as she has been, she may be able to parent appropriately in another two to three years; however, she might never reach that point. Boone stated that in her opinion, at the time of trial, Doris was not capable of providing a safe and stable environment for the children.

The Department's legal case worker, Aurora Garcia, testified that in her opinion Doris is not ready to parent any of the children. She testified that one of the main goals for Doris in the

parenting class was to learn how to redirect the children when they are physically aggressive. Garcia testified that during parent/child visits Doris is still unable to control the children or redirect them when they are aggressive. She testified that Doris had not completed individual counseling. Family counseling had also been recommended, but the plan had been to do it with one child at a time and then move on, depending on progress. Doris began family counseling with the oldest child, but did not make any progress, so the counseling was discontinued.

The oldest child, D.L.A. Jr., was twelve at the time of trial. He had been living with Doris's cousin, Jane, for six months. D.L.A. Jr.'s therapist, the children's guardian ad litem, caseworker Garcia, and Doris all testified that he is doing well in the placement and, although he loves and misses his mother, he wants to continue living with Jane. Jane testified she would like to adopt D.L.A. Jr. if Doris's rights are terminated.

D.L.A. Jr. has a stutter, a history of aggression with other children, especially his siblings, and a history of attempted self-harm and sexually inappropriate behaviors. He has been receiving trauma therapy from Dr. Rosemary Coates since October 2017. Dr. Coates testified that D.L.A. Jr. is very anxious, has problems with boundaries, and that when he speaks about his mother, his anxiety increases and he does not feel safe. She testified that D.L.A. Jr.'s personality had emerged since he had been in therapy. He shows his sense of humor, smiles more, and is engaged. He is consistent in school and his grades are improving. She testified that D.L.A. Jr. needs a consistent, healthy, safe environment that his mother could not provide. She did not believe it would be beneficial for Doris to remain in his life and testified that Doris's rights should be terminated.

Caseworker Garcia testified that D.L.A. Jr. had not expressed an opinion on whether he wanted his parents' rights terminated, but had said he would like to continue visiting his mother. Garcia testified the Department's permanency plan is kinship adoption by Jane. D.L.A. Jr.'s

guardian ad litem and attorney ad litem both recommended Doris's rights be terminated and that D.L.A. Jr. remain with Jane.

Garcia and the guardian ad litem, Irene Cadena, testified about the second oldest child, D.L.A.R., who was ten at the time of trial. They testified D.L.A.R. has the most unresolved issues and is very reserved and difficult to engage. They testified he watches inappropriately sexual adult movies and cartoons and is physically abusive toward the youngest child in the foster home. Cadena testified that the professionals who had evaluated him believe he has suffered sexual abuse. D.L.A.R. told his counselor that he had watched pornography when he was in his mother's care. During family visits, he separates himself from the others and sits alone with a video game or a telephone. He does not interact with his siblings. Doris is seen trying to interact with him, but she is not successful. Garcia testified she does not believe Doris is capable of meeting his emotional needs.

D.L.A.R. had been with the same foster family since June 2017, receiving a specialized level of care. Cadena testified D.L.A.R. does not want to return to his parents, and that the Department's permanency plan is unrelated adoption, although no adoptive family had been identified. Cadena, Garcia, and the attorney ad litem all recommended that Doris's rights be terminated.

B.B.R. was nine at the time of trial. Cadena testified B.B.R. does not have behavioral problems. He is doing well in therapy and in school. He and his brother B.L.A.R. were originally in the same foster home, and Cadena testified B.B.R. has made significant progress since they were separated. She testified that B.B.R. loves his mother and misses his family, but does not think he would be safe if he were reunited with them and he is happy in his current placement. Garcia testified the permanency plan for B.B.R. is unrelated adoption. She stated that a potential

adoptive family has been identified and that B.B.R.'s foster family is willing and able to care for him until an adoptive home is found.

The youngest boy, B.L.A.R., was seven years old at the time of trial. Doris testified that B.L.A.R. was Bill's favorite and he spoiled him. When B.L.A.R. did something wrong, Bill took it out on the other boys. As a result, the other boys were abusive toward him. B.L.A.R.'s therapist, Rosemary Coates, testified the trauma he suffered in his home had manifested itself in various ways such as encopresis, enuresis, and inappropriate behaviors such as exposing himself to a little girl in the classroom. B.L.A.R. has been in therapy with her since September 2017, and is making progress. His encopresis has ceased, but he regresses with his enuresis. Coates attributed the regressions to his visits with his mother, and she believes his interactions with Doris are harmful to his mental healing. Coates testified that the problems B.L.A.R. exhibits are common in children who have been sexually exposed or abused. She testified the problems can and will be addressed in trauma therapy; however, she has not reached that point with B.L.A.R. yet. Coates testified that B.L.A.R. has developed a relationship with the foster parents, who are very kind and patient with him and his behaviors and who provide a safe and healthy environment for him.

Caseworker Garcia and B.L.A.R.'s foster mother, Laura, testified that he needs constant supervision and cannot be left alone with other children. He is disruptive in class, manipulative, defiant, and acts maliciously toward other children. Laura testified B.L.A.R. said he wants to stay in her home and is happy being separate from his brothers. He expressed fear that if he returned home he would be harmed by his brothers and his mom. He knew the judge would make the decision and said he did not want to make the decision. Laura testified that she is willing to give B.L.A.R. stability and is committed to providing him a safe and stable home for as long as it takes. Garcia, Coates, and Cadena all testified they believed Doris's rights should be terminated.

The youngest child, J.R., was born with significant health issues and requires services from multiple specialists. She is in a foster-to-adopt home, and Doris stipulated in her affidavit of relinquishment that termination of Doris's parental rights is in J.R.'s best interest.

The children's guardian ad litem testified the four boys have gone from extreme physical abuse, neglectful supervision, family violence, and instability to places with structure, security and stability. She testified that they all understood that "the deficits" in their previous home is not in their best interest. They had communicated to her that they love their parents but know they are not safe there. She testified the children had wavered on whether they wanted contact with their mother—sometimes they wanted to visit and sometimes they did not. However, they did not waver about whether they wanted to live with her. They did not; and they did not want to live with each other. Guardian Cadena testified all of the boys expressed that they are afraid, that they do not trust their mother, and that they fear she would put them in danger again. Cadena testified that termination of Doris's parental rights is in the children's best interest even though there is not a permanency plan for some of the boys.

Doris testified she had been working as a housekeeper at a hotel for a year and that she was about to return to work after maternity leave. She testified she was staying with a family friend at the time of trial, but had just signed a lease for a three-bedroom apartment and planned to move in the following week. She testified that only D.L.A. Jr. has expressed his desires to her, and that he wants to stay in his placement with Doris's cousin. Nevertheless, Doris did not believe her parental rights to D.L.A. Jr. should be terminated. Doris testified that the other three boys should be returned to her and that she was ready to parent them. She did not believe they were receiving the emotional and physical support they needed in foster care. In her testimony at trial, Doris continued to deny she ever hit any of the children. She stated the children's trauma and aggression

towards each other was due to abuse by Bill and to having witnessed domestic violence between Bill and Doris.

*Discussion*

Doris's rights as to J.R. were terminated because Doris executed an irrevocable affidavit of relinquishment, in which she affirmatively stated that termination of her parental rights is in J.R.'s best interest. Doris also testified at trial that termination is in J.R.'s best interest. A parent's knowing relinquishment of rights and attestation that termination is in the child's best interest ordinarily satisfies the requirement that the court's best-interest finding be supported by clear and convincing evidence. *In re K.S.L.*, 538 S.W.3d at 112. Doris has not made any argument that this case presents extraordinary circumstances, and the record does not support one.

With respect to the four boys, Doris argues termination of her rights was not in the children's best interest because she completed all of her plan except for counseling. She contends she was working hard in counseling, was making progress, and will eventually be able to care for and parent the boys. Doris faults the initial caseworkers for not putting her and the boys in therapy earlier, asserting that this delayed their recovery.

The record establishes that Doris bears much of the fault for the trauma the children have suffered, and she has not yet taken responsibility for her own role. She faces years of therapy and may never be in a position to safely and appropriately parent the children. In her visits with the boys, she became overwhelmed and was unable to redirect their behaviors or successfully interact with them. The boys remained fearful of returning to their mother. At the time of trial, D.L.A. Jr. was in a home with a relative who wanted to adopt him and a potential adoptive family had been located for B.B.R. Both D.L.A.R. and B.L.A.R. were in foster homes where they had stability and specialized care and services. They had been in those homes for more than six months and the families were committed to providing the care the boys needed until permanent homes are found.

We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Doris's parental rights is in the best interest of the children.

## DAN'S APPEAL

The trial court terminated Dan's parental rights as to D.L.A. Jr. after finding that: (1) Dan failed to support D.L.A. Jr. in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition, (2) Dan knowingly engaged in conduct that resulted in his conviction and imprisonment and inability to care for D.L.A. Jr. for not less than two years from the date of filing the petition, and (3) termination of Dan's rights is in D.L.A. Jr.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F) & (Q); 161.001(b)(2). On appeal, Dan challenges the legal and factual sufficiency of the evidence to support the findings under subsections 161.001(b)(1)(F) and (Q).

In seeking to terminate parental rights under subsection Q, the Department must first establish the parent engaged in conduct that resulted in his conviction and imprisonment for a period of at least two years following the date of filing the petition. *See In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003). The parent must then produce some evidence showing that he made arrangements for the care of the child during his imprisonment. *See In re H.RM.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam); *In re J.J.C.*, No. 04-14-00577-CV, 2015 WL 452231, at *2 (Tex. App.—San Antonio Jan. 28, 2015, no pet.) (mem. op.); *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied). The care must be offered by a person who agrees "to assume the incarcerated parent's obligation to care for the child" during the incarceration. *In re H.R.M.*, 209 S.W.3d at 110. Simply leaving the child in the care of another who agrees to take the child in is not enough; the parent must show that another is willing to assume the parent's duties and act on his behalf. *See id.*; *In re D.Z.R.-M.*, No. 14-13-01084-CV, 2014 WL 1390289, at *9 (Tex. App.—Houston [14th Dist.] April 8, 2014, no pet.) (mem. op.). If the parent produces evidence

he has arranged for such care, his rights may still be terminated if the Department establishes that the arrangements do not satisfy the parent's duty to the child. *See In re D.Z.R.-M.*, 2014 WL 1390289, at *9. Dan contends the Department failed to meet its burden under subsection Q because his mother testified she would care for D.L.A. Jr. during Dan's incarceration.

Doris testified that Dan was arrested soon after D.L.A. Jr. was born in 2005. At that time, Dan arranged for Doris and D.L.A. Jr. to live with Dan's mother in Oklahoma. Doris testified they stayed there until D.L.A. Jr. was about one and one-half years old. They had not seen Dan's mother in the eleven years since then. Doris testified the last time D.L.A. Jr. saw Dan was almost eight years before trial, when D.L.A. Jr. was five. She testified Dan gave her some money at times over the years, but he never paid child support. He has sent some letters for her to read to D.L.A. Jr. and made some telephone calls to try to talk to D.L.A. Jr. However, Dan conceded that he did not have a relationship with his son. Caseworker Garcia testified that D.L.A. Jr. considered Bill, not Dan, to be his father.

The evidence established that Dan pled guilty in July 2015 and was sentenced to serve twenty-four years in federal prison for conspiracy to commit drug trafficking. His projected release date is May 2038. He arrived at the federal correctional facility in Wilmer, West Virginia in December 2016. The record shows the petition was served there in March 2017, and Dan testified he received a copy of it June 2017. Counsel was appointed at the beginning of October 2017.

Caseworker Garcia testified she sent a letter to Dan at the prison in July 2017, but she did not ever receive a response. Dan stated he did not receive a letter. He further testified that he attempted to contact Garcia through the prison email system, but was unsuccessful. Garcia testified she did not receive an email from Dan. She also testified that no one contacted her or the Department before trial offering to care for D.L.A. Jr. on Dan's behalf during his incarceration or

suggesting the name of another who was willing to assume Dan's parental obligations. D.L.A. Jr.'s caregiver, Jane, testified she knew Dan from when he and Doris were together. She testified that D.L.A. Jr. had been in her care for seven months at the time of trial and she had not received any support, letters, or calls inquiring about D.L.A. Jr.

At trial, in February 2018, Dan testified that D.L.A. Jr. could live with his mother in Oklahoma. He testified he was not aware that D.L.A. Jr. has serious emotional care needs for which he is seeing a therapist, and did not know what other kinds of services or educational needs he has. Dan's mother testified by telephone from Oklahoma that she was willing to take D.L.A. Jr. if he needed a place to live. She testified she has a two-to-three bedroom house and a job she could go back to if necessary. Her plan for caring for D.L.A. Jr. was to make "sure he's well taken care of, has a roof over his head, food, schooling and education." However, she has not seen D.L.A. Jr. in eleven years and testified she was not aware of any abuse he may have suffered. She stated she had "no idea" what D.L.A. Jr.'s needs are and had not set up any counseling or therapy. Although she testified she would "take care of" counseling if D.L.A. Jr. needed it, there was no evidence that she was willing and able to provide the emotional support, speech therapy, and trauma therapy he needs.

Dan argues he met his burden by having his mother testify at trial that she would care for D.L.A. Jr. He contends that his and his mother's lack of knowledge of D.L.A. Jr.'s needs and the Department's inability to determine whether his mother's home is a suitable placement are due solely to the Department failing to make any efforts to find Dan or any of his family until long after the suit was filed. We disagree.

As a parent, Dan had the duty to know where his son was and to ensure his needs were being met. Dan was D.L.A. Jr.'s father when he was sentenced in 2015 and sent to prison. Yet he did not arrange for his mother or anyone else to assume his parental responsibilities. And he did

not do so in June 2017, when he admits he received the petition seeking termination of his and Doris's parental rights. He did not even posit a suggestion until trial in February 2018, eighteen months after suit was filed. Although Dan blames the caseworker and the Department for the lack of communication, there was evidence Dan was in regular communication with his mother, his lawyer, and Doris. Not one of them contacted the Department regarding a plan for Dan's mother or anyone else to assume Dan's responsibility for D.L.A. Jr. Dan's mother's offer to care for D.L.A. Jr., made eighteen months after the petition was filed and made without having learned about or having made any arrangements for D.L.A. Jr.'s special emotional and therapeutic needs, is insufficient.

The Department established by clear and convincing evidence that Dan will be imprisoned for far more than two years after the date the petition was filed. The record also establishes that Dan did not make arrangements for someone else to assume his parental obligations to D.L.A. Jr. while he was in prison. We conclude the evidence was both legally and factually sufficient to support the trial court's finding of grounds to terminate Dan's parental rights under subsection 161.001(1)(Q).

Only one predicate ground of section 161.001(b)(1) must be proven to support an order of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362. Because the evidence is sufficient to support the trial court's finding of the (Q) ground and Dan does not challenge the trial court's best interest finding, the trial court's order terminating Dan's parental rights is affirmed. We do not reach Dan's challenge to the trial court's finding under subsection 161.001(1)(F).

We affirm the trial court's Order of Termination.

Luz Elena D. Chapa, Justice