

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-20-00081-CV

**IN THE INTEREST OF E.C.G.**, J.C.G., J.J.G., J.A.G., J.Z.G., and E.R.G., Children

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2018PA01841
Honorable John D. Gabriel, Judge Presiding[1]

Opinion by:  Luz Elena D. Chapa, Justice

Sitting:  Sandee Bryan Marion, Chief Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: November 25, 2020

AFFIRMED

D.T.[2] appeals the trial court's order, rendered after a bench trial, that terminated the parent-child relationship between D.T. and six children. We conclude the evidence is legally and factually sufficient to support the trial court's finding that termination is in the children's best interest, and we affirm the trial court's order.

## I. BACKGROUND

The Texas Department of Family and Protective Services filed an original petition in August 2018, seeking emergency orders, conservatorship, and termination of parental rights. The trial court rendered an emergency order for the protection of six children, who were then between

---

[1] Senior Judge, sitting by assignment
[2] To protect the identity of the minor children, we refer to the parents and the children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

the ages of one month and five years: E.C.G., J.C.G., J.J.G., J.A.G., J.Z.G., and E.R.G. The Department was made the children's temporary managing conservator. The trial court extended the mandatory dismissal date, and the case remained on the court's docket for over seventeen months before it proceeded to a three-day trial to the court in January 2020. The trial included testimony from eighteen witnesses, including the parents and mother's new boyfriend, the children's therapists (Manuel Davis and Donna Carrasco), D.T.'s therapists (Carlos Nunez, Suzanne Martinez Campos, and Christina Gracia), Department witnesses (caseworkers Briana Lane, Rebecca Salinas, and Kristen Torres, and investigation supervisor Marvin Ferris), two parents who fostered the children while the case was pending (K.T. and L.K.), the CASA volunteer, an SAPD detective, and two visitation monitors.

At the conclusion of the trial, the court found by clear and convincing evidence that D.T. knowingly placed the children in or allowed the children to remain in conditions that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children, and failed to comply with court-ordered provisions of the family service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), & (O). The trial court also found by clear and convincing evidence that termination of her parental rights is in the children's best interest. *See id.* § 161.001(b)(2). The trial court rendered judgment terminating the children's relationship with both their parents and appointed the Department to be their permanent managing conservator.

D.T. timely appealed the termination order. She does not contest the trial court's findings of grounds to terminate her parental rights. She argues only that the evidence is legally and factually insufficient to support the trial court's finding that termination of her rights is in the children's best interest.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

To terminate parental rights under section 161.001 of the Texas Family Code, the Department must prove by clear and convincing evidence one of the grounds in subsection 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b). In assessing the sufficiency of the evidence to support the trial court's findings, we employ a heightened standard of review to determine whether the trial court could have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). We review for legal sufficiency by examining the entire record in the light most favorable to the findings, assuming any disputed facts were resolved in favor of the findings if a reasonable factfinder could do so and disregarding any evidence the factfinder reasonably could have disbelieved. *See id.* at 256. We review for factual sufficiency by evaluating the disputed evidence to determine if it is so significant that a factfinder could not reasonably have formed a firm belief of or conviction on the challenged finding. *Id.* In our review, we remain mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we may not substitute the trial court's judgment with our own. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a court must also presume that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining what is in the child's best interest, the court may consider evidence about the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child

now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *see C.H.*, 89 S.W.3d at 27. These factors are not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* at 28. And, although the mere fact that an act or omission occurred in the past does not establish that termination is currently in the child's best interest, a parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.).

### III. THE CHILDREN'S BEST INTERESTS

**A. The history of abuse and neglect**

At the time of trial, D.T. was twenty-four years old, with six children aged seven and under. D.T. and her children had been continuously involved with the Department for almost two and one-half years, and the children had been in foster care for over seventeen months.

The Department received a referral in August 2017, after D.T. called the police to report the children's father, C.G., had struck her in the face, chased her around the apartment with a machete, and hit one of the children's head against the tile floor. No criminal charges were filed, but a Department case was opened. A Department investigation supervisor and caseworker Briana Lane testified the Department was concerned about domestic violence, parenting, stability of the

living situation, drug use, and the children's hygiene. D.T. signed a safety plan agreeing not to allow C.G. to have any contact with the children, and the Department began providing family-based services.

Caseworker Lane testified that during the year D.T. was receiving family-based services, D.T. continued to allow the children to have contact with C.G., but she would not tell the Department where C.G. was or how to contact him. Lane testified D.T. failed to complete a domestic violence course and failed to obtain stable housing. During the course of that year, D.T. and the children had lived in an overcrowded apartment with D.T.'s mother, who had an extensive history with the Department, with D.T.'s grandparents, who were not able to accommodate all of them, and at Haven for Hope. There continued to be hygiene problems, with daycare workers reporting the children arrived dirty, smelling of urine, and wearing dirty diapers.

C.G. testified he and D.T. had been in a violent relationship since 2012. He testified he would curse at the children when he disciplined them, but he invoked his Fifth Amendment rights when asked questions about physical discipline of his children and violence between him and D.T. C.G. admitted that he continued to use drugs after the Department became involved, he did not engage in services, and he avoided the caseworker because he was still doing drugs. He also testified that D.T. allowed him to visit with the children even though there was a safety plan in place. Sometimes D.T. dropped the children off with C.G. at his girlfriend's apartment where they would play with his girlfriend's six children.

In August 2018, C.G. was arrested after he severely beat his girlfriend's one-year-old child, who suffered a lacerated liver, multiple rib fractures, and other injuries. A San Antonio Police Department detective testified that during the investigation, visible injuries were found on the girlfriend's other children. In July 2019, C.G. was convicted in five separate cases of intentionally

and knowingly causing bodily injury to a child, and he was sentenced to ten years in prison pursuant to a plea bargain.

Caseworker Lane testified D.T.'s children were removed from her in August 2018, after the children disclosed that they had been present when C.G. was abusing his girlfriend's children. C.G. confirmed at trial his children had witnessed him hitting the other children.

Besides witnessing C.G.'s abuse of his girlfriend's children, the three oldest children, E.C.G., J.C.G., and J.J.G. (who were seven, five, and four at the time of trial), told caseworkers, their therapists, and their foster mothers about violence they had suffered at C.G.'s hands and seen their siblings suffer. All three of them made outcries about C.G. hitting one of the boy's head against the wall. One of the foster parents testified E.C.G. told her C.G. had done this because he was angry they were jumping on the bed. E.C.G. told his therapist he had watched C.G. "pounding" another of the boy's head into the ground. E.C.G. and J.C.G. further reported that C.G. would slap them and hit them with a belt. The children reported that D.T. was present in the home when much of this happened.

## B. D.T.'s ability to protect the children from emotional and physical danger

D.T.'s caseworkers testified that for more than a year after the case was filed and two years after the Department opened its case, D.T. made very little progress. She refused to believe C.G. would harm any child, even though she had once reported him to the police for assaulting her and harming one of their children. She continued to deny his abusive behavior after he was arrested and even after he was sentenced. The caseworkers testified D.T. would not acknowledge her children had suffered any trauma or that she or C.G. had done anything wrong. D.T. also continued having contact with C.G. and lied about it. She told her caseworker and testified at a hearing that she had no contact with him. Yet, the Department introduced tapes of telephone conversations between C.G. in jail and D.T. At trial she admitted she had lied about not having contact with him,

and testified she visited him, talked to him on the telephone, and put money in his account. She also paid for a post office box, believing they could correspond in writing without the Department finding out.

Caseworker Torres testified that halfway through the case, D.T. had completed most of the service plan and was engaged in therapy, but the case was not progressing. She testified D.T. was going through the motions, but had not gained any understanding of what the Department's concerns were, what the children had suffered, or her role in it. Torres testified D.T. had learned what words to say, but did not follow through. For example, D.T. would verbalize that she needed to learn to control and redirect the children, but did not do so at the visits. Torres testified D.T. had also learned to say she knew that her children had suffered trauma and that she needs to listen to them, but when one of the children tried to talk to her about his anger, D.T. would not listen to him, and that harmed him more. D.T. testified she had lied to caseworkers and therapists through the first year of the case; she pretended to believe C.G. had committed the acts he was accused of and pretended to understand her children had been harmed and she had a role in it. She admitted she had not been truthful about the domestic violence she had suffered. She testified she had lied so she could get her children back.

D.T. was treated by three therapists during the case. The first therapist testified D.T. minimized any domestic violence and was very loyal to C.G. D.T. firmly did not believe the criminal allegations against him. The therapist testified D.T. also did not believe she needed counseling and denied the children had behavioral issues other than being upset because of the Department's involvement. D.T. was discharged for missing sessions. D.T.'s second therapist testified D.T. progressed in terms of being engaged, staying in contact, and remaining employed. But she continued her relationship with C.G. and remained confident he had not abused the

children. D.T. wanted him to be able to Facetime with the children and seemed to be angrier at C.G.'s girlfriend than at C.G. D.T. was last seen by the second therapist in June 2019.

D.T. then began seeing a specialist, Christina Gracia, in August 2019. Gracia testified D.T. has been fully engaged in therapy with a positive attitude, and is making slow, incremental progress. She testified D.T. had been in a domestically violent relationship since she was fifteen years old and she internalized it, believing it to be "normal." Gracia testified D.T. had only recently acknowledged that C.G. abused the children and begun to understand that it is not "normal." Gracia testified D.T. still does not appreciate the trauma the children went through and has not yet acknowledged the part she played in allowing the trauma to occur. She testified D.T. does not understand her role as a perpetrator of violence because of her failure to protect the children from it. She stated D.T. is not yet able to identify what she failed to do that would have prevented removal of her children.

Gracia was also engaged to do family therapy when the children were ready. At the time of trial, she had seen the three oldest children and had one individual therapy session with each of them and D.T. Gracia believes the family sessions are helping D.T. to get an idea of the children's trauma, although she has not yet fully demonstrated an understanding. Gracia testified D.T. is committed to healing and loves her children very much. However, the therapist believes it will take much more time for D.T. to process everything and to reestablish bonds with the children. Gracia also testified D.T. does not have a support system that would allow her to adequately care for the children. She understands that D.T. has a new boyfriend, but she had not met him before trial, and Gracia believes that putting the children in a home with an unknown man would be traumatizing.

Gracia does not believe D.T. is ready to be reunited with the children or that it would be in the children's best interest. She testified D.T. might be ready after six months to a year of continued therapy.

D.T. testified that sometime around September 2019, after the case had been pending more than a year, she realized she "needed to get serious and step up." She testified that her new therapist, Gracia, and her new boyfriend helped her to see things differently. She testified she now understands her children trusted her and she did not protect them. D.T. says she is taking an additional parenting class targeted to parents of children with certain mental health diagnoses and her new boyfriend has been going with her. However, she testified she also understands that if the children are returned to her, it may be a long time before they can meet her boyfriend.

Although the evidence supports D.T. is no longer in contact with C.G., it also supports D.T. does not yet understand that failing to protect the children from violence is itself abusive and she has not demonstrated she is able to be protective. The evidence also establishes D.T. does not yet understand the trauma the children have suffered, much less know how to address it or prevent it in the future. The trial court reasonably could have concluded from the evidence that returning the children to D.T. would pose a risk to their physical and emotional well-being. Thus, these factors support the trial court's best interest finding.

## C. D.T.'s stability and ability to meet children's physical needs

D.T. testified she can meet the children's physical needs. She testified she has a good job, earning $570 a week, and anticipates a raise. She has been working afternoon and evening shifts, but is trying to change to the morning shift. D.T. stated if the children were returned to her now, her sister would pick the children up from day care and care for them until she got home with help from D.T.'s grandmother. Caseworker Torres agreed that D.T.'s current employment is a good job. However, she pointed out D.T. had five different jobs during the case and had only just

recently completed her on-the-job training period for her current job. Torres testified D.T. also has not shown she is able to maintain a home, budget, and pay the bills to manage a household. And Torres also disagreed that D.T.'s support system is adequate. As D.T. acknowledged at trial, both her sister and her grandmother have stated that they are unable to care for all the children at once.

D.T. also testified she was getting a new three-bedroom apartment the weekend following the trial. She stated it took her a long time to find one because she had previous evictions and had not previously earned enough money. At the time of trial, D.T. was staying at her mother's house and sleeping at her new boyfriend's house three or four nights a week. Caseworker Torres testified she was first made aware during trial that D.T. may have a new apartment. Torres made some inquiries and learned D.T. did not yet have a lease and D.T. would need to qualify for some programs and provide requested documentation regarding her previous evictions before they would rent to her. Torres testified the Department would need to see the apartment and D.T. would need to ensure it is appropriately furnished. The children would not be allowed to live at D.T.'s mother's house because it has only two bedrooms for ten people and because of the mother's extensive history with the Department. Torres testified the Department had not evaluated D.T.'s boyfriend's home because the address had not been provided before trial.

The evidence supports D.T. has taken steps toward stability. However, at the time of trial, she did not have the income, housing, or support system necessary to provide for the children's physical needs. This factor also weighs in support of the trial court's finding.

## D. Family visits and D.T.'s parenting abilities

D.T. had weekly supervised visits with the children for over a year. Two visitation monitors, two caseworkers, two foster mothers, and the CASA volunteer all testified the visits were chaotic. The children would physically fight, jump on the furniture, be too rough with the baby, and disrupt other families' visits. D.T. would either not redirect them or would try to, but

fail to follow through when the children ignored her. Even after asked not to, D.T. also repeatedly brought the children large sugary drinks and bags of candy for snacks.

Caseworker Torres testified she met with D.T. after the visits and would discuss strategies to manage the children. Torres testified D.T. listened and was receptive, but the next visit nothing would change. Torres testified she was concerned that if D.T. was unable to have them listen and respond to her in a one hour visit once a week, she would not be able to take them to the grocery store or on the bus and keep them safe.

The CASA volunteer was appointed the month after the case was filed. She visited the children in their foster placements at least once a month. She testified that although the children were excited to see her, they did not climb on furniture or throw toys and were not frantic, as they were at visits with D.T. The older children also responded to redirection in their foster homes. When the volunteer visited the baby in his foster home, he was very playful and animated; whereas, he was "just blank" during visits with D.T.

L.K. and K.T., the foster mothers who parented the children through most of the case testified the children became very anxious when they were told a visit was approaching. Foster mother L.K. testified J.A.G., who was toilet trained, would urinate inappropriately and smear feces on the wall if he knew a visit was coming. K.T. testified she stopped telling the children a visit was approaching, but then things were much worse after the visits, stating, "We paid for visits for days." K.T. and L.K. testified the children would revert in their behavior after visits: they started hitting, kicking, spitting, and screaming again; J.J.G. would have nightmares and be unable to sleep; J.A.G. would have night terrors; J.C.G. would wet the bed; and E.C.G. and J.C.G. would have increased impulse control and behavioral issues at school.

After the case had been pending about ten months, the children's therapists jointly recommended temporarily suspending the visits because of the anxiety the visits caused the

children. The therapists and foster mothers testified that when the visits were suspended, the children's behavior improved significantly. The court ordered several additional family visits, the last of which was in August 2019, and which was observed by both of the children's therapists. Caseworker Torres testified it was the best visit D.T. had with her children. However, the children's therapists testified the visit was chaotic and did not go well at all because D.T. was unable to keep the children calm or focused.

D.T. moved to resume visits, but the motion was opposed by the children's attorney ad litem. In October 2019, the trial court ordered that visits could occur only as part of family therapy sessions with Gracia. Those sessions were to begin only when the children's individual therapist believed the child was ready. At the time of trial, the three oldest children had each had one individual therapeutic session with D.T. and family therapist Gracia.

The two youngest children, J.Z.G. and E.R.G. continued to have visits alone with D.T. The CASA volunteer observed the last three of these visits. The volunteer testified J.Z.G., who was two and one-half years old, was happy to see D.T.; they interacted well. However, the volunteer believed this was in large part because the visit was at the Department with both the volunteer and a monitor present, and the baby, E.R.G., was not moving around. She testified that the entire time, either D.T. was holding the baby in one arm or he was strapped in a highchair. This allowed D.T. to focus solely on J.Z.G., and, even then, D.T. periodically disengaged throughout the visit.

The volunteer testified although D.T. was working to improve her parenting skills, she still struggled. She testified D.T. had shown she was not able to keep more than three of the children at a time physically and emotionally safe. The CASA volunteer also testified that in her opinion, D.T. was not ready to care for even just the two youngest children full time.

The evidence established that at the time of trial, D.T. had yet to learn the skills needed to safely parent the children outside of a controlled environment, and therefore this factor weighs in favor of the finding that termination of D.T.'s rights is in the children's best interest.

**E. The children's emotional well-being and emotional needs**

When the children were removed from their parents, the four older children were extremely aggressive with each other and with other children. These four received trauma-focused cognitive behavioral therapy throughout the case. Their therapists, Manuel Terry Davis and Donna Carrasco, testified the children have suffered trauma and are afraid, which manifests as anger, aggression, and issues with impulse control. The therapists testified the children have expressed fear and feeling unsafe around their parents. They are primarily afraid of their father, but expressed fear their mother will take them where their father is, as she had in the past, and will not protect them. The therapists testified the children need continued therapy, in which they are learning relaxation and calming techniques to help them with impulse control.

### 1. E.C.G. (seven years old at time of trial)

K.T. fostered E.C.G. for about six months during the case. She testified E.C.G. and J.J.G. were placed with her at the same time and had significant behavioral issues when they arrived. They threw things across the room, cursed, and screamed. She could not send them to their room because they would slam their heads and bodies against the wall, scratch themselves, and destroy their schoolwork and backpacks. After working with them to learn how to calm themselves for a few months, the behaviors improved. In July 2019, E.C.G. moved into L.K.'s foster home where his two sisters and brother J.A.G. were living. L.K. testified E.C.G.'s behavioral problems continued to lessen, especially after the family visits were suspended.

L.K. and therapist Carrasco testified E.C.G. is very angry with his mother for having allowed his father to hurt him and his siblings and he did not want to go to family visits.

Caseworker Torres testified E.C.G. struggles with security, confidence, and ability to trust. Therapist Davis testified E.C.G. has a high need for positive reinforcement.

E.C.G. had a therapeutic visit with D.T. and family therapist Gracia in November 2019. According to L.K., the visit did not go well, and E.C.G. regressed to being very impulsive and aggressive afterward. He shoved a child into a fence at school, hit another in the face, and would repeatedly turn the lights on and off. Gracia's impression from the therapeutic visits was that E.C.G. was aloof and uninterested, and he did not appear to have a bond with D.T.

### 2. J.C.G. (five years old at time of trial)

J.C.G.'s foster mother for most of the case, L.K., testified J.C.G. was very angry with her parents. She testified J.C.G. was initially very aggressive with her younger siblings, throwing things at them and hitting them, but that behavior had improved over time. Several of the witnesses testified J.C.G. is also "bossy" to the younger children and tries to tell them what to do, in an attempt to parent them. L.K. also testified J.C.G. had a problem with bed-wetting after family visits. The bed wetting stopped when the visits were suspended and the problem had not resurfaced.

J.C.G.'s therapist, Davis, testified J.C.G. is hyperactive and has impulse control issues, but at the time of trial, did not exhibit seriously concerning behaviors. He testified J.C.G. loves her mother, but still feels afraid and unsafe with her. Gracia testified she had one therapeutic visit with J.C.G. and D.T. Gracia believed J.C.G. was apprehensive during the session.

### 3. J.J.G. (four years old at time of trial)

As discussed above, foster parent K.T. testified J.J.G. was extremely impulsive and destructive when he and E.C.G. were placed in her home. She testified he also had significant behavioral challenges at day care. He climbed on things and was unable to stay seated. He hit, spit, and yelled at people. He once hit a child in the face with a rock because the child did not want to

play with him. K.T. testified the behavior improved when E.C.G. moved to another foster home and the baby, E.R.G., was placed with J.J.G. in her home. J.J.G. and the baby had been together since July 2019, and K.T. testified J.J.G. is very protective of the baby and they have a good bond.

Therapist Donna Carrasco treated J.J.G. throughout the case. Carrasco testified J.J.G. both witnessed and experienced abuse. She testified J.J.G. had nightmares nightly for several months. At the time of trial, they had become less frequent, but he still had them when he was triggered or anxious. Carrasco testified J.J.G.'s anxiety and physical aggression was so bad in mid-2019 she was afraid he might need to be hospitalized.

Carrasco testified it took a long time for J.J.G. to feel safe enough to begin talking. They engaged in play therapy because J.J.G. was aggressive with other children, frequently hitting them in the head with blocks and other toys. He engaged in the same behavior in his play therapy and, when Carrasco asked him about it, J.J.G. said, "That's what my daddy did to me and [J.A.G.]." J.J.G. told Carrasco several times his father hit his head against the wall and "there was blood." The therapist testified J.J.G. was, and still is, very angry with his mother. He feels she was present for the abuse, aware of it, and did not stop it. Carrasco and J.J.G. worked in therapy towards J.J.G. using his words to tell D.T. he was angry at her for not protecting him. She testified J.J.G. finally tried to talk to D.T. about the physical abuse at a visit, but he returned from the visit even angrier, saying D.T. would not listen to him. Carrasco testified J.J.G. usually became more aggressive after visits with D.T., but that time it was much worse. He was angry for months and did not want to see D.T. anymore.

J.J.G.'s therapist also testified he has a "trauma bond" with his older siblings. That means they can act as a trigger for each other. For J.J.G., his siblings are a trigger because they were present when C.G. physically abused him, and when they are all together, he feels he is back in that situation. On the other hand, the youngest child E.R.G. does not act as a trigger for him and

J.J.G. sees his role as E.R.G.'s protector. Carrasco opined that visits with D.T. were a bigger trigger than those with his siblings.

Carrasco testified J.J.G. started making significant progress after he was put on a mood stabilizer to help with his anxiety and after the family visits were suspended. She testified that in the several months before trial when there were no family visits, J.J.G. had been calmer and less aggressive overall, he started to talk more openly, and was making progress learning to control his anger.

J.J.G. had one therapeutic visit with D.T. and family therapist Gracia in January 2020, shortly before trial. Carrasco testified J.J.G. would not talk to her about the visit afterward. Gracia testified J.J.G. was dismissive of D.T. at the visit and said "I want to go" several times during the last twenty or thirty minutes of the session. She testified J.J.G. was "very, very adamant about going back to the caregiver."

Carrasco recommended J.J.G. not be placed in a home with his siblings (other than the baby) or with D.T. She testified that for J.J.G. to continue making progress, he needs a stable home where he feels safe and a structured environment in which his behavior and anxiety can be managed.

### 4. J.A.G. (three years old at time of trial)

During the case, E.C.G., the oldest, told his therapist and the CASA volunteer that the children had watched C.G. "pound" J.A.G.'s head against a hard surface. J.A.G.'s foster mother, L.K., testified he suffers from night terrors. He also exhibited disturbing behaviors, such as urinating inappropriately and smearing feces on the walls when he knew a visit was approaching. These behaviors stopped when the family visits stopped.

J.A.G.'s therapist, Manuel Davis, testified J.A.G. has diagnoses of speech delay, sensory processing disorder, and ADHD. Davis testified J.A.G. is extremely hyperactive and has a problem

with impulse control. He said that it can take up to fifteen minutes in their sessions just to calm J.A.G. down enough to proceed. Davis testified he was working with J.A.G. on self-regulation and deep breathing. Caseworker Torres testified J.A.G. is receiving speech and occupational therapy.

### 5. *J.Z.G. (two years old at time of trial)*

J.Z.G.'s foster mother, L.K., testified J.Z.G. had problems with night terrors and aggression. She stated the terrors occurred both at night and during naps, and at times she would wake up during naps screaming as if she were being severely harmed. L.K. and caseworker Torres also testified J.Z.G. is very aggressive with other children, hitting them with toys and biting them hard, leaving large bruises. The caseworker acknowledged aggression and biting are not unusual in toddlers, but testified J.Z.G. had exhibited these behaviors since she was removed from her parents and the behaviors worsened around family visits.

### 6. *E.R.G. (seventeen months old at time of trial)*

E.R.G. was only three weeks old when he was removed from his parents. His foster mother, K.T., and the caseworker testified E.R.G. suffers separation and stranger anxiety. He is very clingy and loving with his primary caregiver, but screams when she leaves the room or drops him off at daycare and cries when someone he is not close to touches him or tries to pick him up.

Caseworker Torres testified E.R.G. is the child least bonded with D.T. and she does not think he recognizes D.T. as his mother. She testified that when he saw D.T. at visits, he reacted as if she were a stranger, wincing, turning away, and crying. Torres testified this had improved over time, but it still happened sometimes. The CASA volunteer testified E.R.G. does not move around during the visits. Either D.T. holds him or he simply sits and sucks on his cup or a piece of food. The CASA volunteer testified this is in significant contrast to the behavior she observed in his foster home, where E.R.G. was very active.

The evidence established these children suffered trauma that manifests in different ways and they need continued therapy and individual attention to address their anxiety and particular behavioral challenges. They also need stability and to feel protected. D.T. does not yet fully understand their trauma or her role in causing it and does not know how to address it. This factor therefore also supports the finding that termination is in the children's best interest.

## F. Desires of the children

D.T. testified she talked to all of the children and they all told her they wanted to go home with her. However, there was conflicting evidence from other witnesses. Gracia agreed that each of the three oldest children, in their individual family therapy sessions with D.T., told D.T. that "it would be okay to go home." Gracia testified she believes the children said this because they did not want to hurt D.T.'s feelings. She testified that her observation of the children's behavior with D.T. during the sessions and then their behavior with their caregivers after the sessions, leads her to have serious concerns about whether the children actually have any desire to live with D.T. full time.

Caseworker Torres and E.C.G.'s foster mother testified they each had a conversation with E.C.G. in the two weeks before the trial. E.C.G. told them he did not want to go live with D.T., and he wanted to stay with his siblings in a foster home and ultimately be adopted. The CASA volunteer met with the four oldest children the Sunday before trial. She testified E.C.G. told her he wanted her to tell the judge he wants to be adopted because his mom did not keep them safe. E.C.G.'s therapist, Manuel Davis, testified E.C.G. had told him multiple times he did not feel safe with his mother and he wants to stay in his foster home. Davis acknowledged that after his therapeutic visit with D.T., E.C.G. said he wanted to go live with her because she was getting a new apartment. Davis testified that E.C.G. subsequently told him he wanted to stay in his foster home.

Five-year-old J.C.G.'s foster mother testified that two weeks before trial, J.C.G. told her she wanted to be adopted and did not express a desire to go back and live with D.T. J.C.G. did not express a preference when the CASA volunteer met with her before trial. Four-year-old J.J.G. told both the caseworker and the CASA volunteer that he misses D.T. He told caseworker Torres he likes where he is living and wants to stay there. The CASA volunteer testified three-year-old J.A.G. told her that he likes the house where he is. None of the witnesses, other than D.T., testified about the desires of the two youngest children, J.Z.G. and E.R.G.

The evidence supports that the older children love and miss D.T. It also supports that the oldest child, E.C.G., wants to remain with his siblings in his foster home. The evidence regarding the other children's desires is not as strong and we do not give it much weight because they are so young. We conclude that as to E.C.G., this factor supports the trial court's finding, but this factor is neutral regarding the other children.

## G. The Department's plans for children

The caseworkers testified they attempted to place the children with family members, but either the homes were unsuitable or the relatives were unwilling or unable to care for the children.

At the time of trial, four of the children, E.C.G., J.C.G., J.A.G., and J.Z.G., had been in a foster home together for seven months and had recently moved together to a foster-to-adopt home. The other two children, J.J.G. and the baby, E.R.G., are together in a different foster-to-adopt home. J.J.G.'s therapist, Carrasco, believes it is in his best interest for him not to be in a home with his other siblings because of the trauma bond they have. However, J.J.G. has a strong positive bond with E.R.G.

Caseworker Torres testified the two foster families are in communication with each other and have committed to allowing the siblings to have contact with each other. She testified she believes the placements will lead to permanency for all of the children and is in their best interest.

Family therapist Gracia testified the children are "very well placed, … well adjusted, and they are thriving." This consideration supports the trial court's finding that termination of D.T.'s parental rights is in the children's best interest.

## IV. CONCLUSION

The evidence presented by the parties on the *Holley* factors weighs strongly in favor of the trial court's best-interest finding. The evidence established that late in the case—over a year after the children were removed and placed in foster care and over two years after the Department began providing services—D.T. began to take the matter seriously and began making slow, incremental progress toward acknowledging and understanding the effects of many years of domestic violence. The evidence also established that at the time of trial, D.T. did not yet fully understand the trauma her children suffered, her role in causing the trauma, or how to prevent her children from suffering future trauma. The children were still distrustful and did not believe she could be protective of them. D.T. was not yet able yet to meet their emotional needs or their physical needs. The evidence further established D.T. was not able to control, direct, or effectively discipline the children. Gracia believed it would take at least an additional six months to a year of continued therapy before D.T. might be ready to reunite with the children.

The children are in foster-to-adopt homes with their siblings, making good progress in their therapy, and thriving. Caseworker Torres, the CASA volunteer, and the family therapist all testified the children need permanency and stability, and that it would not be in their best interest to delay finalizing their permanent placements while waiting for D.T. to learn how to parent them and to be able to meet their emotional and physical needs. The children's attorney ad litem argued likewise to the trial court. The trial court agreed.

Having reviewed all of the evidence, we conclude the trial court could have reasonably formed a firm belief or conviction that termination of D.T.'s parental rights is in children's best

interest. The evidence is both legally and factually sufficient to support the trial court's finding. *See J.F.C.*, 96 S.W.3d at 266. We therefore affirm the trial court's order terminating D.T.'s parental rights.

Luz Elena D. Chapa, Justice